**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| LARRY BALL, | | |
| Plaintiff, | | 8:15CV95 |
| vs. | | |
| CITY OF LINCOLN, NEBRASKA, CHRIS BUETLER, Mayor of the City of Lincoln; JAMES PESCHONG, Lincoln Chief of Police; and SMG, a Pennsylvania General Partnership; | | MEMORANDUM AND ORDER |
| Defendants. | | |

This matter is before the Court on the Motion for Preliminary Injunction, or in the alternative, Motion for Temporary Restraining Order (Filing No. 2) filed by Plaintiff Larry Ball ("Ball"). The parties, through counsel, appeared before the Court for a hearing on Ball's Motion on March 16, 2015. At the hearing, the parties agreed to consolidate their arguments on the Motion for Preliminary Injunction and the Motion for Temporary Restraining Order. After the hearing, the parties filed briefs in support of their positions. For the reasons stated below, the Motion will be denied.

## BACKGROUND[1]

### I.  Arena Speech Policy

In September of 2013,[2] Defendant City of Lincoln (the "City") opened the Pinnacle Bank Arena (the "Arena"), a large, modern sports and entertainment venue to replace the fifty-year-old Pershing City Auditorium.  The City contracted with Defendant

---

[1] For purposes of Ball's Motion, the essential facts are not in dispute, unless otherwise indicated.

[2] Although the City's statement of facts indicates the Arena opened in September 2014, that appears to be a clerical error.  The Court takes judicial notice of the fact that the Arena opened in September 2013.

SMG, a facilities management company, to operate the Arena.  SMG is an international company that manages hundreds of stadiums and arenas and had a contract to manage Lincoln's Pershing Auditorium before the Arena opened.

Defendants assert that when the Arena opened, SMG adopted a policy (the "Policy") regarding access to the Arena's exterior areas. The purpose of the Policy was to establish consistent and neutral limitations that would allow for efficient and safe entry of crowds as large as 12,000 to 15,000 people attending Arena events.  The Policy was also intended to preserve the plaza in front of the Arena's main entrance for use by Arena tenants and exhibitors.  In October 2014, a written version of the Policy, with accompanying diagrams, was posted on the Arena's website, and paper copies were made available to members of the public. (*See* Pinnacle Bank Arena/SMG Exterior Access and Use Policy, Filing No. 1-7.)  The Policy stated that its purpose was to "consistently and efficiently manage the use of the exterior areas around the [Arena], to assure convenient access to Arena Patrons, and to respect the contractual rights of Arena tenants, acts, and exhibitors."  (Policy, Filing No. 1-7 at ECF 1.)  To further this purpose, the Policy prohibited certain types of public communication within a defined area:

> Leafleting, signature gathering, promotional material distribution, merchandise sales, and picketing are only allowed within the Arena and the non-public forum exterior Arena areas at the request of a Tenant, the Tenant's contractual entity and/or the artists or productions they represent.

(Policy, Filing No. 1-7 at ECF 1.)  The Policy defined the "non-public forum exterior Arena areas" (the "Policy zone"), as "areas that extend out to the public sidewalk perimeter and include walkways, steps, verandas, terraces, access ramps, parking lots,

loading ramps, the Arena Festival Space/parking lot, and the Arena premium parking garage."  (Policy, Filing No. 1-7 at ECF 1.) A diagram of the Policy zone appears below as Figure 1:



Figure 1: Policy zone perimeter around Arena property (Policy, Filing No. 1-7 at ECF 2.)

In a plaza located at the southeast corner of the Arena property, near the main entrance to the Arena, Defendants assert that the boundary of the Policy zone is marked with landmarks such as metal stanchions, cement planters, and distinctly colored concrete. There is no evidence as to how the Policy zone is marked, if at all, on

other areas of the Arena property.  The Court will refer to that part of the plaza within the Policy zone as the "Plaza Area."

## II.     Ball's Expressive Activity

Ball is a citizen of Lancaster County, Nebraska.  As part of his religious devotion, Ball attempts to share Christian messages by passing out pamphlets. On March 15, 2014, Ball was handing out pamphlets to people entering and leaving the Arena. Defendants claim that Ball stood immediately outside the entrance to the Arena while leafleting. He was not aggressive or confrontational, and he described himself as friendly with the crowd.  Ball was confronted several times by SMG employees, who told him to leave.  Ball did leave but soon returned, and SMG employees again told him to leave.  This time Ball refused and police were called.  Ball was arrested and ticketed by the Lincoln Police Department for trespassing and refusing to comply under the Lincoln Municipal Code.   Ball challenged the ticket and his arrest on First Amendment grounds, and the City Attorney dismissed the charges.

Ball was arrested again and ticketed for trespassing on March 5, 2015. Defendants assert that Ball was leafleting in the Plaza Area.  SMG staff provided Ball with a copy of the Policy and asked Ball to move out of the Plaza Area to the nearby sidewalk.   Ball refused to move, and Lincoln City Police officers cited him for trespassing.  After receiving the citation, Ball left the Arena property.

On March 7, 2015, Ball was again leafletting near the Arena.  Defendants contend he was in the Policy zone.  He was asked to move; he refused; and he was cited for trespassing.  Ball asserts that when he was ticketed, he was on a sidewalk designated as a public thoroughfare.  After being cited, Ball left the Arena property.

4

## STANDARD

A district court considers the four factors set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc), when deciding whether to issue a preliminary injunction. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011) (citing *Dataphase*, 640 F.2d at 114). Those factors are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 114. "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 974 (D. Neb. 2008). The movant bears the burden of establishing the propriety of the injunction. *See Roudachevski*, 648 F.3d at 705.

## DISCUSSION

### I.  Likelihood of Success on the Merits

"In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir.1995)). In a First Amendment case, "the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007) *modified on reh'g*, 545 F.3d 685 (8th Cir. 2008) *overruled on other grounds*, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

Ball's complaint alleges that the Defendants violated his First Amendment rights by designating public property as a nonpublic forum and chilling his exercise of free

5

speech rights.  Defendants argue that the Plaza Area is not a traditional public forum open to the public for expressive activity.  Defendants also assert that even if the Plaza Area is considered a traditional public forum, the Policy is narrowly tailored to advance a significant government interest.  Based upon the evidence at this early stage, the Court concludes that the Plaza Area is likely not a traditional public forum, and the Policy is likely reasonable in light of the Plaza Area's designated purpose.

> **A.  Public Forum Analysis**

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has stated that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 799–800 (1985).  "The Supreme Court has 'adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013) *cert. denied,* 134 S. Ct. 824 (2013) (quoting *Cornelius,* 473 U.S. at 800). "The extent to which the Government can control access depends on the nature of the relevant forum." *United States v. Kokinda*, 497 U.S. 720, 726 (1990) (quoting *Cornelius,* 473 U.S. at 800).

The Supreme Court has identified three categories of forums:  (1) the traditional public forum, (2) the designated public forum, and (3) the nonpublic forum.  *Perry Edu. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).  Traditional public

forums include "places which by long tradition or by government fiat have been devoted to assembly and debate" and in such forums "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* at 45.  Traditional public forums are those that have "immemorially been held in trust for the use of public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions . . . ." *Id.* (internal quotation marks omitted).  The Supreme Court has specifically recognized "streets, sidewalks, and parks" as traditional public forums.  *U.S. v. Grace*, 461 U.S. 171, 177 (1983).  "In these quintessential public forums, the government may not prohibit all communicative activity."  *Perry*, 460 U.S. at 45.  A content-neutral regulation of speech in traditional public forums will only be upheld if it is narrowly tailored to serve a compelling government interest.  *Perry*, 460 U.S. at 45;  *Grace*, 461 U.S. at 177.

The same protection provided to traditional public forums "is provided to speakers in a 'designated public forum,' defined as 'public property which the State has opened for use by the public as a place for expressive activity.'"[3] *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011) (quoting *Perry*, 460 U.S. at 45).  "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum."  *Perry*, 460 U.S. at 46.

In the third category of forum, "[p]ublic property which is not by tradition or designation a forum for public communication," states may "preserve the property under

---

[3] Ball does not directly argue that the plaza area at issue in this Motion is a designated public forum, and no evidence supports such an argument.  Specifically, no evidence suggests that the Defendants opened the plaza area for the purpose of expressive conduct.

its control for the use to which it is lawfully dedicated."  *Id.* (internal marks and citation omitted).  "Only if the public entity provides 'general access' does the public property become a designated public forum; if access is 'selective,' it is a nonpublic forum." *Victory*, 640 F.3d at 334 (quoting *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680 (1998)). A regulation of speech in public forums will be upheld if it is reasonable "and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Perry*, 460 U.S. at 46.

The parties' arguments and evidence focus on the Plaza Area.[4]  Accordingly, although the Court may refer to other areas and walkways to determine how the Plaza Area is used, the Court's forum analysis for purposes of this Motion focuses solely on the Plaza Area.  Specifically, the Court must assess whether the Plaza Area looks, acts, and functions like a public sidewalk, or whether it is a nonpublic forum, restricted to authorized uses.   The Court recognizes that "[n]o clear-cut test has emerged for determining when a traditional public forum exists," and   "[i]n the absence of any widespread agreement upon how to determine the nature of a forum, courts consider a jumble of overlapping factors, frequently deeming a factor dispositive or ignoring it without reasoned explanation."  *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1099-100 (9th Cir. 2003).  Nevertheless, the Eighth Circuit has instructed that in determining whether a particular piece of publicly owned property is a

---

[4] Ball generally challenges the Policy's designation regarding the "sidewalks and public plaza surrounding the Pinnacle Bank Arena." (Compl., Filing No.  1 ¶ 15.)  Ball's Complaint and arguments do not directly challenge whether the parking lots, loading docks, and other restricted areas to the west, north, and east of the Arena are traditional public forums. These areas appear to have the characteristics of nonpublic forums. *See Victory*, 640 F.3d at 334. Because the parties' arguments and evidence do not directly address these areas, the Court will assume without deciding that they are nonpublic forums, and not in dispute for purposes of this Motion.

traditional public forum, courts must consider (1) whether the area manifests physical characteristics suggesting that it is "open for public passage," (2) "the traditional use of the property, the objective use and purposes of the space," and (3) "the government intent and policy with respect to the property." *Bowman v. White*, 444 F.3d 967, 977-978 (8th Cir. 2006).

### 1.   Physical Characteristics of the Plaza Area

Ball argues that the Plaza Area has the physical characteristics of a sidewalk. As noted above, sidewalks are considered traditional public forums "generally without further inquiry." *Grace*, 461 U.S. at 179. The location and appearance of a walkway are key indicators in determining whether it is a sidewalk for purposes of the public forum analysis. *Id.* For example, in *Grace*, the Supreme Court declared unconstitutional a broad restriction on speech on the public sidewalks surrounding the Supreme Court building. 461 U.S. at 175-81. In holding that the walkways surrounding the Court building were traditional public forums, the Supreme Court noted that "sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and we can discern no reason why they should be treated any differently." *Id.* The Court explained further that there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180.

The Supreme Court reached the opposite result regarding a walkway near a post office. *Kokinda,* 497 U.S. at 726. In *Kokinda*, the Court examined whether a walkway leading from a dedicated parking lot to a post office was a traditional public forum. *Id.* at

9

723, 726. The Supreme Court concluded that the walkway did not have "the characteristics of public sidewalks traditionally open to expressive activity." *Id.* at 727. The Court reasoned that the walkway was constructed "solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." *Id.* at 728. Moreover, the Court recognized that because the walkway led only from the dedicated parking lot to the post office, it was not a public thoroughfare that enjoyed traditional public forum protections. *Id.* at 727.

In cases involving arenas and stadiums, courts have determined that where surrounding walkways blend into the urban grid and appear like any sidewalk, such walkways are traditional public forums. *See, e.g. United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 451-53 (6th Cir. 2004) (holding that sidewalks surrounding a privately owned stadium and arena were public forums because they blended into the urban grid, bordered the road, and looked like any public sidewalk). In contrast, another court held that a plaza directly in front of an arena was not a public forum because "it would be clear to pedestrians visiting the plaza that they have entered into property intended for use by patrons attending Arena performances." *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205, 214 (D. Conn. 2011) *aff'd sub nom. Zalaski v. City of Bridgeport Police Dep't*, 475 F. App'x 805 (2d Cir. 2012) (reasoning that the plaza was separated from public streets and sidewalks by landscaping, a grassy area, and a private driveway).

Defendants argue that unlike the Supreme Court sidewalks at issue in *Grace*, the boundary of the Plaza Area is marked with planter boxes, stanchions, distinctly colored

10

concrete, and other features that indicate to patrons that the Policy zone is a "special type of enclave." *Grace*, 461 U.S. at 180.  This Court acknowledges that other courts have held such cosmetic differences insufficient to mark an area as a nonpublic forum. *See e.g. Venetian Casino Resort, L.L.C. v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937, 945 (9th Cir. 2001) (concluding that distinctive paving and landscaping were insufficient to distinguish an area from surrounding public forum); *United Church of Christ*, 383 F.3d at 452 (concluding that fifteen-foot long planter boxes along a public sidewalk did not permit the average observer to understand the "geographic significance of this sporadic vegetation.").

In this case, concrete planter boxes and metal stanchions—on their own—may not permit an average observer to identify the boundaries of the Plaza Area. For example, the evidence shows that a walkway along the eastern boundary of the Arena property and a pedestrian overpass from a nearby parking lot empty into the Plaza Area.  There is no evidence before the Court that any of the boundary elements identified by Defendants separate that walkway or the pedestrian overpass at their respective entrances to the Plaza Area.  Assuming the walkway and pedestrian overpass themselves are traditional public forums, pedestrians using them may not discern that they have entered a more restricted space when reaching the Plaza Area.

The boundary elements identified by Defendants along the southern edge of the Plaza Area are less distinctive than the landscaping and grassy area that separated the plaza from the arena in *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d at 214.  As shown in Figure 2, the boundary line of the Policy zone does not follow the

11

boundary elements precisely, nor does it follow the distinctive concrete coloring which is carried outside the Plaza Area onto public sidewalks and into the street.



Figure 2: Plaza area photographs (Policy, Filing No. 1-7 at ECF 4-5.)

Though these boundary elements may be less distinctive than those in other cases where courts declared areas to be nonpublic forums, the Court does not consider such physical barriers in a vacuum. The Court must also "[acknowledge] the presence of any special characteristics regarding the environment in which [the Plaza Area] exist[s]." *Bowman*, 444 F.3d at 975. The Plaza Area has several special characteristics that distinguish it from a sidewalk. Unlike the sidewalk in *United Church of Christ*, 383 F.3d at 452, it cannot be said that the Plaza Area seamlessly blends into the urban grid, borders the road, or looks like a public sidewalk. Although the stanchions and planter boxes may not, on their own, indicate to the public that they have "entered some special type of enclave," *Grace*, 461, U.S. at 180, the boundary elements combined with the size, shape, and general appearance of the Plaza Area serve to distinguish it from the adjacent public sidewalk. The very presence of a large public sidewalks bordering the Plaza Area signals that the Plaza Area is intended to serve a more limited function. *See Int'l Soc'. For Krishna Consciousness v. Lee,* 505 U.S. 672, 680 (1991) ("[S]eparation

from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction.").

Based on the evidence before the Court at this time, the Plaza Area's special physical characteristics viewed as a whole suggest the Plaza Area is separate from adjacent traditional public forums.   Even if this factor were neutral, however, other factors suggest the Plaza Area is a nonpublic forum.

### 2.      Use and Purposes of the Plaza Area

Ball argues that because the Plaza Area is used as a public thoroughfare, it should be treated as a sidewalk under the forum analysis.   "A traditional public forum is a type of property that 'has the physical characteristics of a public thoroughfare, the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, and historically and traditionally has been used for expressive conduct.'"  *Bowman*, 444 F.3d at 975 (quoting *Warren v. Fairfax County,* 196 F.3d 186, 191 (4th Cir.1999) (internal marks omitted).   The evidence at this early stage suggests that the Plaza Area may be used, at least in part, as a public thoroughfare.   Red arrows in Figure 3 show how the flow of pedestrian traffic from the ground level pedestrian walkway and pedestrian overpass mentioned above may flow across the Plaza Area to other locations in the City's Haymarket district.   Ball does not submit evidence showing these walkways are used in this manner, but Defendants do not dispute this potential use, nor do they directly challenge the Plaza Area's use as a public thoroughfare.



Figure 3: Detailed map of plaza area (Policy, Filing No. 1-7 at ECF 3.)

If the Plaza Area is a thoroughfare that provides open public access, the Court must then determine whether the objective use and purpose of the Plaza Area is inherently compatible with expressive conduct, and whether the Plaza Area historically and traditionally has been used for expressive conduct.[5]  At least one court in this circuit

---

[5] When an area is found to be a public thoroughfare, there appears to be a circuit split as to whether further analysis is necessary. The Ninth Circuit has held that "when a property is used for open public access or as a public thoroughfare, we need not expressly consider the compatibility of expressive activity because these uses are inherently compatible with such activity." *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1101 (9th Cir. 2003). In contrast, the Second Circuit has held that a forum's "primary function and purpose" is most significant in determining whether traditional public forum status applies.  *See Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 550 (2d Cir. 2002).

The Eighth Circuit has not expressly adopted one view over the other. In *Bowman*, the Eighth Circuit cited *ACLU v. Las Vegas*, but also specifically noted that "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." 444 F.3d at 978 (citation omitted).  Because the Eighth Circuit in *Bowman* considered purpose and use in addition to whether an area was a public thoroughfare, this Court will do likewise.

has held that public plazas "are 'traditional' public fora and, hence, occupy a 'special position in terms of First Amendment protection' that leaves the [government] with a 'very limited' ability to restrict expressive activity there." *Occupy Minneapolis v. Cnty. of Hennepin*, 866 F. Supp. 2d 1062, 1069 (D. Minn. 2011) (quoting *Boos v. Barry,* 485 U.S. 312, 318 (1988)). The Supreme Court, however, has held that not all areas that appear and function as public thoroughfares are traditional public forums, and the "location and purpose" of a publicly owned thoroughfare is critical to determining whether such an area constitutes a public forum.  *See Kokinda*, 497 U.S. at 727, 728-29; *see also Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 550 (2d Cir. 2002) ("The observation that the [Lincoln Center Plaza] is used in ways similar to a public park or thoroughfare, however, does not end the inquiry. Rather, we must also examine the Plaza's location and purpose.") (internal marks and citation omitted).

As noted above, in its analysis the Court must "acknowledge the presence of any special characteristics regarding the environment in which those areas exist."  *Bowman*, 444 F.3d at 978.  It appears undisputed from the evidence at this stage that the Plaza Area's principal purpose is to serve as a forecourt to the main Arena entrance. Regarding similar areas, courts have held that "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses, or in which the government's ability to restrict speech has historically been circumscribed." *Hotel Employees*, 311 F.3d at 551 (citing *Hawkins v. City & County of Denver,* 170 F.3d 1281, 1287-88 (10th Cir. 1999); *see also Int'l Soc'y for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition*

15

*Authority,* 691 F.2d 155, 161 (3rd Cir. 1982) (holding that the Meadowland Sports Center is not a public forum because it is a "commercial venture by the state . . . designed to bring economic benefits to northern New Jersey" and was not intended to serve "as a place for the exchange of views").

There is no evidence that the Plaza Area traditionally was used as a place for the free exchange of ideas.  Evidence before the Court at this stage demonstrates that Defendants consistently used the Plaza Area for commercial purposes related to events inside the Arena. (Lorenz Aff., Filing No. 13-2 ¶ 3.)  SMG has permitted expressive conduct only outside the Policy zone during Arena events.  (Lorenz Aff., Filing No. 13-2 ¶ 6.)  The walkway and pedestrian overpass that allow the Plaza Area to function as a public thoroughfare only exist because of the Arena.   (Filing No. 1-5 at ECF 17. ) Though it appears that the walkway and pedestrian overpass permit pedestrians to cross the Plaza Area to the Haymarket district and other areas of the City, they do not appear to "form part of the City's transportation grid in the way that traditional streets and sidewalks do. The ability of pedestrians to cross the Plaza as a short-cut between surrounding streets is merely an incidental feature of its principal function as the entrance plaza for the [Arena]."  *Hotel Employees*, 311 F.3d at 550; see also *Bowman*, 444 F.3d at 978 (stating that even where public property possesses characteristics of a public forum, the purpose of the property must still be considered).

The objective purpose of the Plaza Area was not to provide a place for the exchange of public views, nor has the Plaza Area traditionally been used for such expressive activity.  *See Bowman*, 444 F.3d at 975.  Accordingly, the Court concludes that this factor favors a finding that the Plaza Area is a nonpublic forum.

16

### 3.   Government's Intent and Policy

Ball does not dispute that Defendants' current policy is to exclude expressive conduct within the Plaza Area.  This factor is an important consideration where an area bears some characteristics of a public forum.   For example, the Eighth Circuit in *Bowman* noted that on a university's campus, areas that possessed the characteristics of a public forum could be treated as nonpublic forums when the intent, policy, and purpose with respect to such areas "is not to provide a forum for all persons to talk about all topics at all times."   *Id.* at 978.   However, the court rejected a university's argument that some areas at issue should be treated as nonpublic, because the university permitted speech by university and non-university entities in those areas.  *Id.* In contrast, SMG's practices are clearly reflected in its Policy.

Ball argues that the City's documents show the Plaza Area was designed to be a public sidewalk integrated into the City's public access grid.  He notes that some Arena project documents reference "public plaza space."[6]  Ball cites generally to the evidence to support his assertion, and the Court's extensive review of the planning and design documents (Filing Nos. 1-1 through 1-13) did not reveal any specific reference to the Plaza Area as a public sidewalk, nor is there any specific reference to the Plaza Area suggesting it was intended to be a public forum. The label "public" in planning documents would not be determinative as to whether the government intended the Plaza Area to be open to expressive activity.   Based upon the evidence before the

---

[6] Some documents indicate that a "public plaza area" would be depicted on an accompanying map. The map is missing in some of the exhibits (*see e.g.* Filing No. 1-5 at ECF 17 (referencing a "MAP OF SITE" that included a "public plaza area" but no map is attached)), and not legible in others (see e.g. Filing No. 1-3 at ECF 1, 20, referencing a MAP OF SITE that includes a "public plaza area" but such an area is not identified in the attached map)).

Court, the Defendants' policies and intent favor a finding that the Plaza Area is not a traditional public forum.

Weighing the three factors articulated by the Eighth Circuit, the Court concludes that the Plaza Area has several physical characteristics common to public forums, and it may function as a type of public thoroughfare, yet use of the Plaza Area as a forum for unlimited public expression would be inconsistent with the Plaza Area's principal purpose and traditional use. The City's purpose in establishing the Plaza Area, and the Policy implemented for its use, also suggest the Plaza Area was not intended to be used as a public forum.  Accordingly, for purposes of this Motion, the Court concludes that Ball is not likely to prevail on his claim that the Plaza Area is a traditional public forum.

### B.      Reasonableness of Restriction

"When public property is not by tradition or designation a public forum, the controlling public entity 'may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Victory*, 640 F.3d at 334 (quoting *Perry,* 460 U.S. at 46). "Control over access to a nonpublic forum may be based on the subject matter of the speech, on the identity or status of the speaker, or on the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand."  *Id.* (citing *Cornelius,* 473 U.S. at 806–09).  "The restriction on access must be 'reasonable in light of the purpose which the forum at issue serves.'"  *Id.* (quoting *Perry,* 460 U.S. at 49).  However, "a

restriction 'need not be the most reasonable or the only reasonable limitation.'" *Id.* (quoting *Cornelius,* 473 U.S. at 808).

The Court first notes that it is undisputed that the Policy is content neutral.  It broadly prohibits specific expressive conduct inside the Arena and the Policy zone without regard to the content of the speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

Regarding reasonableness, Defendants specifically identify their need to control large crowds moving through the Plaza Area, as the crowds approach the Arena to attend events such as concerts and athletic competitions.  Although the evidence suggests that Ball was at all times peaceful and respectful, expressive conduct within the Plaza Area amid large crowds of people, exhibiting various degrees of sobriety and excitement, could give rise to concerns for the safety of patrons, staff, the general public, and the persons attempting to engage in expressive conduct.  The boundary line for the Policy zone appears to be set based on legitimate business concerns related to safety, security and efficiency.  The Policy does not restrict all speech inside the Policy zone, but only leafleting, signature gathering, promotional material distribution, merchandise sales, and picketing. (Filing No. 1-7 at ECF 1.) The Policy notifies speakers of the types of expressive conduct prohibited, and does not restrict other types of speech within the Policy zone.

The availability of nearby areas open for expression also supports a finding that the Policy is reasonable. "The reasonableness of a restriction on access is supported

when 'substantial alternative channels' remain open for the restricted communication." *Id.* (quoting *Perry,* 460 U.S. at 53). The evidence in the record indicates that the Plaza Area falls between the main Arena entrance and the City's Haymarket district. While Ball expressed a desire to distribute his leaflets in an area where crowds approaching the south entrance of the Arena are most congested, the Policy does not deprive him of access to pedestrians approaching the south entrance of the Arena, nor does not substantially alter his desired leafletting position. If Ball distributes his leaflets on the walkways outside the Plaza Area, he simply will communicate with the crowd when it is not at its most congested point. Accordingly, the Court concludes at this juncture that the Policy likely is reasonable.

Because Ball has not demonstrated that the Plaza Area is a traditional public forum, and the Policy appears to be reasonable considering the Plaza Area's characteristics, Ball has not shown that he is likely to prevail on the merits. The Court recognizes that evidence may be produced in discovery demonstrating that the Plaza Area is a public forum, in which case the Court will need to determine whether the Policy is narrowly tailored to advance significant government interests.[7] At this juncture, however, the Court concludes that Ball is unlikely to prevail.

---

[7] If the Plaza Area is shown to be a traditional public forum, the Policy must withstand intermediate scrutiny, which is more stringent than the reasonableness standard the Court employs here. *See Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013), The "efficient conduct of business operations," *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1554 (8th Cir. 1995), and crowd control, *Johnson*, 729 F.3d at 1099, have been recognized as significant government interests under an intermediate scrutiny standard. If the evidence produced in discovery demonstrates that the Plaza Area is deemed to be a traditional or designated public forum, the Defendants will not be able to rely on these significant interests in the abstract. Instead, they must demonstrate a nexus between the Policy and the interest it seeks to serve. *Johnson*, 729 F.3d at 1099.

20

## II.     Threat of Irreparable Harm

Ball claims that he suffers the imminent threat of irreparable harm because of the Defendants' actions in preventing him from distributing his leaflets in the Plaza Area.  "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013).  Ball has not shown that the Plaza Area is a public forum, nor has he shown any threat that he will be prevented from distributing his message on the adjacent public sidewalk.  Accordingly, Ball has not demonstrated a threat of irreparable harm.

## III.    Balance of the Harms

In determining whether a preliminary injunction should issue, the Court must consider whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.  The evidence demonstrated that the public sidewalk where Ball is permitted to distribute his leaflets is very near his desired location, and he should be able to reach many, if not all, of his target audience as they approach the Arena.  If the Policy is stricken, Defendants would be unable to control activity in the Plaza Area.  Ball will not suffer a serious infringement of his rights as further evidence is developed in this case. The balance-of-harms factor weighs against the granting of a preliminary injunction.

## IV.    Public Interest

The public interest is served by free expression on issues of public concern. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988).  However, Ball has not shown he is likely to

prevail on his claim that his First Amendment rights have been unconstitutionally restricted, nor that the enforcement of the Policy pending the resolution of this action will seriously impair his freedom of expression.   The public interest is also served by the promotion of public safety, which is one objective of the Policy.   Accordingly, the public-interest factor does not weigh in favor of issuance of a preliminary injunction.

**CONCLUSION**

Ball has not demonstrated that he is likely to prevail on the merits of his claim. He has not demonstrated it is more likely than not that the Plaza Area by the Pinnacle Arena entrance is a public forum, nor has he demonstrated it is more likely than not that the Defendants' Policy restricting certain expressive activity in the Plaza Area is unreasonable. The other *Dataphase* factors also weigh against issuance of a preliminary injunction.  Accordingly,

IT IS ORDERED:

The Motion for Preliminary Injunction, or in the alternative, Motion for Temporary Restraining Order (Filing No. 2) filed by Plaintiff Larry Ball, is denied.


Dated this 14th day of April, 2015

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge

22