**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| LARRY BALL, | ) | Case No. 8:15CV095 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT CITY OF LINCOLN'S** |
| CITY OF LINCOLN, NEBRASKA, a | ) | **BRIEF IN SUPPORT OF MOTION FOR** |
| political subdivision of the State of | ) | **SUMMARY JUDGMENT** |
| Nebraska; and SMG, a Pennsylvania | ) | |
| General Partnership, | ) | |
| | ) | |
| Defendants. | ) | |

Defendant City of Lincoln, Nebraska, pursuant to Fed. R. Civ. P. 56 and NECivR 56.1, offers this brief in support of its Motion for Summary Judgment (Doc. #55) on the claims in the Complaint (Doc. #1) of Plaintiff Larry Ball ("Plaintiff"). Summary judgment is merited because there is no genuine dispute as to any material fact, and the Court should be able to decide the claims as a matter of law, because (1) the Plaza Area where Plaintiff was leafleting and was ticketed is not a traditional public forum, but is instead a nonpublic forum, (2) the principal purpose of the Plaza Area is for use by tenants of the Arena and for safe entry by patrons, not for expressive activities, and it lacks any historical use for those purposes, (3) the SMG Policy is a reasonable, viewpoint neutral restriction on expressive activities, and (4) Plaintiff had ample alternatives and opportunity to conduct his expressive activity on the "R" Street sidewalk only a few feet away from where he was cited each time on the Plaza Area.

City submits the following Brief in Support of Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

1.    Plaintiff Larry Ball is a resident and citizen of the City of Lincoln, Lancaster County, Nebraska. (Complaint, ¶ 3 (Doc. #1, at CM/ECF p. 1); Answer of City, ¶ 1 (Doc. #22, at CM/ECF p. 1); Deposition of Larry Ball, 12:9-19 ("Depo. Ball") (Doc. #56-5, at CM/ECF p. 4))

2.　　　Defendant City of Lincoln, Nebraska ("City") is a political subdivision and city of the State of Nebraska that owns the Pinnacle Bank Arena and associated improvements and facilities for the benefit of the citizens of the City of Lincoln. (Complaint, ¶ 4 (Doc. #1, at CM/ECF p. 1); Answer of City, ¶ 2 (Doc. #22, at CM/ECF p. 1))

3.　　　Defendant SMG is a Pennsylvania general partnership that serves as the management company of the Pinnacle Bank Arena and attendant facilities on behalf of City. (Complaint, ¶ 7 (Doc. #1, at CM/ECF p. 2); Answer of City, ¶ 3 (Doc. #22, at CM/ECF p. 1); Answer of SMG, ¶ 7 (Doc. #23, at CM/ECF p. 1))

4.　　　Beginning in 2010, City and the University of Nebraska ("University"), through the creation of the West Haymarket Joint Public Agency ("JPA"), began the redevelopment of the West Haymarket in the City of Lincoln, which included construction of the Pinnacle Bank Arena ("Arena"); several parking garages to the west and south of the Arena; a festival space/surface parking lot to the north of the Arena; a pedestrian overpass or bridge accessing the festival space from the Arena; and new roads, streets, and sidewalks accessing all of these facilities. (Doc. #1-5, at CM/ECF p. 1-16); (Doc. #1-4); Affidavit of Jeffery Kirkpatrick, ¶ 2 ("Aff. Kirkpatrick") (Doc. #56-2, at CM/ECF p. 1))

5.　　　The Arena was to be used in part as the home court for games for the University's men's and women's basketball teams. (Aff. Kirkpatrick, ¶ 2 (Doc. #56-2, at CM/ECF p. 1))

6.　　　The Arena was built to replace the more than fifty year old Pershing Center owned by City and operated for over a decade by SMG, until its last events in 2014. (Aff. Kirkpatrick, ¶ 3 (Doc. #56-2, at CM/ECF p. 1); (Doc. #24, at CM/ECF p. 2))

7.　　　The new roads, streets, and sidewalks constructed adjacent to the Arena did not historically exist prior to construction of the Arena, as the area previously consisted of railroad

tracks for BNSF and Amtrak that were moved to the west to accommodate the Arena and attendant facilities. (Aff. Kirkpatrick, ¶ 4 (Doc. #56-2, at CM/ECF p. 2))

8.     City was in charge of construction and development of the Arena and attendant facilities, roads, streets, and sidewalks pursuant to a Facilities Agreement with the JPA. (Doc. #1-2, at CM/ECF p. 7); (Doc. #1-5, at CM/ECF p. 1-16); Aff. Kirkpatrick, ¶ 5 (Doc. #56-2, at CM/ECF p. 2)

9.     City entered into a Management Agreement with SMG for management of the Arena on June 7, 2012 prior to the Arena's completion, granting SMG the "exclusive right to manage, market, promote and operate the Facilities." (Doc. #1-6, at CM/ECF p. 12); Aff. Kirkpatrick, ¶ 6 (Doc. #56-2, at CM/ECF p. 2); Affidavit of Tom Lorenz, ¶ 2 ("Aff. Lorenz") Doc. #56-3, at CM/ECF p. 1)

10.    Since its opening in the fall of 2013, SMG has had an exterior access and use policy for the Arena. (Aff. Lorenz, ¶ 3 (Doc. #56-3, at CM/ECF p. 1); Deposition of Tom Lorenz, 8:11-20 ("Depo. Lorenz") (Doc. #56-4, at CM/ECF p. 5))

11.    The policy for the Arena, which is similar to one utilized by SMG for many years in its operation of the Pershing Center in the City of Lincoln, is designed to allow for safe and efficient access to the facility for Arena customers as well as to allow the full use of the Arena and Plaza Area for tenants, shows, and exhibits. (Aff. Lorenz, ¶¶ 4, 7 (Doc. #56-3, at CM/ECF p. 1-2); Depo. Lorenz, 8:11-14 (Doc. #56-4, at CM/ECF p. 5))

12.    In October 2014, SMG adopted the written Pinnacle Bank Arena/SMG Exterior Access and Use Policy ("Policy"), complete with accompanying diagrams, consistent with the unwritten policy relied upon since the Arena opened. The Policy was posted on the Arena's website, and copies were made available to members of the public. (Doc. #1-7); (Doc. #13-2, at CM/ECF p. 4-15); Aff. Lorenz, ¶ 5 (Doc. #56-3, at CM/ECF p. 1-2); Aff. Lorenz, Ex. A (Doc.

#56-3, at CM/ECF, p. 5-17); (Doc. #24, at CM/ECF p. 2); Depo. Lorenz, 8:11-20 (Doc. #56-4, at CM/ECF p. 5); Aff. Kirkpatrick, ¶ 7 (Doc. #56-2, at CM/ECF p. 2))

13.     The Policy delineates certain marked exterior areas as nonpublic forum areas reserved for use by tenants and/or the artists or productions they represent, including an exterior plaza located at the southeast corner of the Arena property near the south entrances of the Arena, which is marked with easily described and viewed landmarks or physical characteristics such as cement planters, metal stanchions or bollards, and distinctly colored concrete ("Plaza Area"). (Doc. #13-2, at CM/ECF p. 4-15); (Doc. #24, at CM/ECF p. 3-4); Depo. Lorenz, 21:3-22:11 (Doc. #56-4, at CM/ECF p. 8); Depo. Lorenz, 47:15-24 (Doc. #56-4, at CM/ECF p. 14); Aff. Lorenz, ¶ 6 (Doc. #56-3, at CM/ECF p. 2); Aff. Lorenz, Ex. A (Doc. #56-3, at CM/ECF, p. 5-17); Aff. Kirkpatrick, ¶ 8 (Doc. #56-2, at CM/ECF p. 2)

14.     One of the principal purposes of the Policy is to protect the Plaza Area in front of main doors for use by tenants and/or the artists or productions they represent as the Plaza Area is considered a space included in the tenants/artists' lease of the facility. The Plaza Area is also useful for selling souvenirs and as an exhibit area for trade RV and boat shows. (Aff. Lorenz, ¶ 7 (Doc. #56-3, at CM/ECF p. 2))

15.     The Policy provides that individuals wishing to perform activities within the Plaza Area may do so only with the approval of the tenant, the tenant's contractual entity, and/or the artists or productions they represent. Approval of the use of the Plaza Area is to be sought from the tenant rather than SMG. (Aff. Lorenz, ¶ 8 (Doc. #56-3, at CM/ECF p. 2))

16.     Another principal purpose of the Policy is to ensure safety and crowd management of the Plaza Area. The Plaza Area outside the Arena entrances is used by patrons to enter and exit the Arena before and after performances and sporting events, which can includes crowds up to 12,000 to 15,000 for a single event, and is sometimes used as a security screening

area as well.  (Aff. Lorenz, ¶ 9 (Doc. #56-3, at CM/ECF p. 2-3); Depo. Lorenz, 22:8-13 (Doc. #56-4, at CM/ECF p. 8); Depo. Lorenz, 28:17-22, 30:7-20 (Doc. #56-4, at CM/ECF p. 10); (Doc. #14, at CM/ECF p. 1); (Doc. #24, at CM/ECF p. 2))

17.     The Policy also provides public areas large enough to accommodate large groups. In December 2014, a group of 50 to 60 people perform a "die-in" protest related to Ferguson, Missouri in an area adjacent to the Arena that gave them plenty of room for their protest without disrupting access to the Arena. ((Aff. Lorenz, ¶ 10 (Doc. #56-3, at CM/ECF p. 3); Depo. Lorenz, 35:23-36:2 (Doc. #56-4, at CM/ECF p. 11))

18.     Defendants are aware of Plaintiff Larry Ball (hereinafter "Plaintiff") handing out leaflets in proximity to the Arena on at least four separate occasions.  (Doc. #14, at CM/ECF p. 2); Aff. Lorenz (Doc. #56-3, at CM/ECF p. 3-4)

19.     On March 15, 2014, Plaintiff was handing out religious tracts to people attending the boys state high school basketball tournament outside the Arena, including right outside the doors of the Arena. (Doc. #24, at CM/ECF p. 4); Depo. Ball, 18:8-19:15 (Doc. #56-5, at CM/ECF p. 6); Depo. Ball 33:13-18 (Doc. #56-5, at CM/ECF p. 10); Depo Ball, 93:24-94:14 (Doc. #56-5, at CM/ECF p. 25); Aff. Lorenz, ¶ 12 (Doc. #56-3, at CM/ECF p. 3); (Doc. #13-1, at CM/ECF p. 4-9)

20.     Plaintiff was approached several times by SMG staff who requested that he move outside the Plaza Area and continue his leafleting on the sidewalk. (Depo. Ball, 18:8-24 (Doc. #56-5, at CM/ECF p. 6); Depo. Ball, 33:13-18 (Doc. #56-5, at CM/ECF p. 10); Depo Ball, 45:3-13 (Doc. #56-5, at CM/ECF p. 13); Aff. Lorenz, ¶ 13 (Doc. #56-3, at CM/ECF p. 3); Plaintiff's Answers to Defendant City of Lincoln's Interrogatories and Request for Production of Documents (First Set) ("Plaintiff's Discovery Responses") (Doc. #56-6, at CM/ECF p. 2); (Doc. #13-1, at CM/ECF p. 4-9))

21.     Plaintiff told SMG staff and/or Lincoln police officers he would be leaving and coming back to continue his leafleting. (Depo. Ball, 19:2-9 ([Doc. #56-5, at CM/ECF p. 6](#)); Plaintiff's Discovery Responses ([Doc. #56-6, at CM/ECF p. 2](#)); Aff. Lorenz, ¶ 14 ([Doc. #56-3](#), p. 3); ([Doc. #13-1, at CM/ECF p. 4-7](#)))

22.     Plaintiff returned later that same afternoon around 4:00 p.m. and began leafleting in the Plaza Area north of the bollards. ([Doc. #24, at CM/ECF p. 4](#)); Depo. Ball, 19:15-25 ([Doc. #56-5, at CM/ECF p. 6](#)); Depo. Ball, 37:14-5 ([Doc. #56-5, at CM/ECF p. 11](#)); Depo. Ball, 56:4-15 ([Doc. #56-5, at CM/ECF p. 15](#)); Plaintiff's Discovery Responses ([Doc. #56-6, at CM/ECF p. 2-3](#)); Aff. Lorenz, ¶ 14 ([Doc. #56-3, at CM/ECF p. 3](#))

23.     The Lincoln Police Department was called by SMG staff when Plaintiff refused to move.  Lincoln police officers approached Plaintiff and requested that he move to the sidewalk area outside of the Plaza Area. ([Doc. #24, at CM/ECF p. 4](#)); Aff. Lorenz, ¶ 15 ([Doc. #56-3, at CM/ECF p. 3](#)); ([Doc. #13-1, at CM/ECF p. 4-9](#))

24.     Plaintiff refused to move and asserted that he had every right to hand out the pamphlets where he was located in the Plaza Area. (Depo. Lorenz, Ex. 14 ([Doc. #56-4, at CM/ECF p. 41](#)); Aff. Lorenz, ¶ 16 ([Doc. #56-3, at CM/ECF p. 3](#)); Plaintiff's Discovery Responses ([Doc. #56-6, at CM/ECF p. 3](#)); ([Doc. #13-1, at CM/ECF p. 4-9](#)))

25.     Plaintiff was then arrested and ticketed for trespassing by violating the unwritten Arena use policy and refusing to comply by moving to an alternative location. (Complaint, ¶ 16 ([Doc. #1, at CM/ECF p. 4](#)); Answer of City, ¶ 12 ([Doc. #22, at CM/ECF p. 2](#)); Answer of SMG, ¶ 16 ([Doc. #23, at CM/ECF p. 2](#)); ([Doc. #24, at CM/ECF p. 4](#)); Depo. Ball, 20:16-22 ([Doc. #56-5, at CM/ECF p. 6](#)); Depo. Ball, 40:11-24 ([Doc. #56-5, at CM/ECF p. 11](#)); Aff. Kirkpatrick, ¶ 10 ([Doc. #56-2, at CM/ECF p. 2](#)); Plaintiff's Discovery Responses ([Doc. #56-6, at CM/ECF p. 3](#)); ([Doc. #13-1, at CM/ECF p. 4-9](#)))

26.     The charges against Plaintiff were dismissed by the City Attorney's Office in May of 2014 after a few months without any further incidents by Plaintiff. (Complaint, ¶ 17 (Doc. #1, at CM/ECF p. 4-5); Answer of City, ¶ 13 (Doc. #22, at CM/ECF p. 2); Aff. Kirkpatrick, ¶ 11 (Doc. #56-2, at CM/ECF p. 2))

27.     Nearly one year later, on March 5, 2015, Plaintiff returned to the Arena and began handing out pamphlets to people attending the girls state high school basketball tournament in the Plaza Area north of the bollards in the same spot he was leafleting in 2014, approximately 25 feet from one of the Arena doors. (Depo. Ball, 58:5-21 (Doc. #56-5, at CM/ECF p. 16); Depo. Ball, 63:10-64:10 (Doc. #56-5, at CM/ECF p. 17); Depo. Ball, 93:16-23 (Doc. #56-5, at CM/ECF p. 25); Depo. Ball, Ex. 15 (Doc. #56-5, at CM/ECF p. 42); Aff. Lorenz, ¶ 17 (Doc. #56-3, at CM/ECF p. 3-4); Plaintiff's Discovery Responses (Doc. #56-6, at CM/ECF p. 3); (Doc. #13-1, at CM/ECF p. 12-13))

28.     Plaintiff was again ticketed for trespassing, but not arrested, by the Lincoln Police Department in the Plaza Area on two separate occasions, March 5, 2015 and March 7, 2015, for violating the Policy. (Complaint, ¶ 18 (Doc. #1, at CM/ECF p. 5); (Doc. #24, at CM/ECF p. 4); Depo. Ball, 65:19-68:12 (Doc. #56-5, at CM/ECF p. 18); Depo. Ball, 72:3-24 (Doc. #56-5, at CM/ECF p. 19); Depo. Ball, 73:15-74:9 (Doc. #56-5, at CM/ECF p. 20); Aff. Kirkpatrick, ¶ 12 (Doc. #56-2, at CM/ECF p. 2); Aff. Lorenz, ¶ 18 (Doc. #56-3, at CM/ECF p. 4); Plaintiff's Discovery Responses (Doc. #56-6, at CM/ECF p. 3-4); (Doc. #13-1, at CM/ECF p. 12-13, 17))

29.     Plaintiff was aware of the Policy and had read it prior to leafleting on the Plaza Area in March 2015. (Depo. Lorenz, 26:22-24 (Doc. #56-4, at CM/ECF p. 9); Depo. Lorenz, 54:20-55:11 (Doc. #56-4, at CM/ECF p. 16); Depo. Lorenz, 60:19-61:14 (Doc. #56-4, at CM/ECF p. 16-17); Depo. Lorenz, 87:15-88:11 (Doc. #56-4, CM/ECF p. 23); Aff. Lorenz, ¶ 19

([Doc. #56-3, at CM/ECF p. 4](#)); ([Doc. #56-6, at CM/ECF p. 3](#)); ([Doc. #13-1, at CM/ECF p. 12-13](#)))

30.     During the second weekend of March 2015, Plaintiff leafleted outside the Arena during the boys state basketball tournament, but he stayed on the sidewalk outside the Plaza Area; therefore, Plaintiff was not in violation of the Policy and was not ticketed or approached. ([Doc. #14, at CM/ECF p. 3](#)); Aff. Lorenz, ¶ 20 ([Doc. #56-3, at CM/ECF p. 4](#))

31.     On July 23, 2015, Plaintiff was found guilty of trespassing for the citations issued on both March 5, 2015 and March 7, 2015 and fined $50.00 for each citation. (Aff. Kirkpatrick, ¶ 13 ([Doc. #56-2, at CM/ECF p. 3](#)); Aff. Kirkpatrick, Ex. A ([Doc. #56-2, at CM/ECF p. 4](#)))

32.     Plaintiff has been offered the alternative, on multiple occasions, to move to the sidewalk adjacent to "R" Street south of the Arena property and Plaza Area in order to continue his leafleting and expressive activities. (Depo. Lorenz, 26:22-24 ([Doc. #56-4, at CM/ECF p. 9](#)); Depo. Lorenz, 54:20-55:11 ([Doc. #56-4, at CM/ECF p. 16](#)); Depo. Ball, 60:19-62:23 ([Doc. #56-5, at CM/ECF p. 16-17](#)); Aff. Lorenz, ¶ 21 ([Doc. #56-3, at CM/ECF p. 4](#)))

33.     City and SMG have had no issues with any other members of the public contending the Policy creates an unreasonable restriction of their expressive activities other than Plaintiff. (Aff. Lorenz, ¶ 23 ([Doc. #56-3, at CM/ECF p. 4](#)); Depo. Lorenz, 35:23-36:2 ([Doc. #56-4, at CM/ECF p. 11](#)))

34.     The Lincoln Police Department has not cited any other individuals for trespassing or other criminal violations in connection with the Arena's Policy other than Plaintiff. (Aff. Kirkpatrick, ¶ 14 ([Doc. #56-2, at CM/ECF p. 3](#)))

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. Rule 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In review for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Ricci v. DeStefano,* 557 U.S. 557, 586, 129 S.Ct. 2658, 2677 (2009) (internal quotations and citations omitted); *Moore v. Indehar*, 514 F.3d 756, 757-758 (8th Cir. 2008). The moving party on summary judgment bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Kincaid v. City of Omaha*, 378 F.3d 799, 803-804 (8th Cir. 2004). Once the moving party meets the initial burden to show no genuine issue of fact exists, then the burden shifts to the nonmoving party to produce evidence of the existence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011). "In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue. Rather, we focus on whether a genuine issue of material fact exists for trial-an issue of material fact is genuine if the evidence is sufficient to allow a reasonable jury verdict for the nonmoving party." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citations omitted).

To create an issue for trial, the nonmoving party must produce evidence based on more than speculation, conjecture, or fantasy, *Doe v. Department of Veterans Affairs*, 519 F.3d 456, 460 (8th Cir. 2008), or "some metaphysical doubt as to material fact." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Even if some factual dispute does exist, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).

## ARGUMENT

Defendants City and SMG have already been successful in the preliminary injunction stage of the proceedings. (Doc. #24) The Court considered the following factors in denying Plaintiff his requested preliminary injunction: (1) the likelihood of success on the merits on Plaintiff's claims; (2) the threat of irreparable harm to him without the injunction; (3) the balance between this harm and the City's injury due to an injunction; and (4) the public interest. See *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Likelihood of success on the merits is the most significant factor to be considered in granting a preliminary injunction. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012). For Plaintiff's claims, the Court determined that Plaintiff "has not demonstrated that he is likely to prevail on the merits of his claim." (Doc. #24, at CM/ECF p. 22)

The facts have not changed since the Court's decision on the preliminary injunction. Plaintiff can offer no genuine dispute of any material fact to show: (1) that the Plaza Area should be treated as a traditional public forum; (2) that the Pinnacle Bank Arena/SMG Exterior Access and Use Policy (Doc. #1-7); Aff. Lorenz, Ex. A (Doc. #56-3, at CM/ECF p. 5-17) restricts his expressive activity under the First Amendment in an unreasonable manner; or (3) that he was not provided ample other alternatives for his expressive conduct. Therefore, summary judgment is warranted in this case and should be granted.

## I.    The Plaza Area where Plaintiff was leafleting and was ticketed is not a traditional public forum, but is instead a nonpublic forum.

City should be successful in summary judgment, because there is no genuine dispute of material fact that the Plaza Area is not a traditional public forum (Doc. #24, at CM/ECF p. 6) and should, in fact, be determined to be a nonpublic forum. Government or public property can be classified into one of several categories: (1) traditional public forum, such as streets, sidewalks, and parks, (2) designated public forum, for property not traditionally regarded as public forum

that is nonetheless opened and treated similar to a public forum, typically based on past use, (3) limited public forum, for property limited to speech for certain groups and subjects related to the property's purpose, like universities or art centers, and (4) nonpublic forums. See *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45-46, 103 S. Ct. 948, 954-55 (1983); *Christian Legal Soc. Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 679, 130 S.Ct. 2971, 2984, fn 11 (2010). Traditional public forums are areas of government properties that have historically been open to the public for speech activities, *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014), whereas nonpublic forums are government properties that have not traditionally been opened to expressive use by the public, *Ark. Educ. Tv Comm'n v. Forbes*, 523 U.S. 666, 678-79, 118 S. Ct. 1633, 1641 (1998). "[I]n public property constituting a 'nonpublic forum,' the government enjoys significantly greater latitude to regulate expressive activity, including the ability 'in some circumstances' to 'ban the entry . . . of all persons except those who have legitimate business on the premises.'" *Hodge v. Talkin*, 799 F.3d 1145, 1153 (D.C. Cir. 2015), quoting *United States v. Grace*, 461 U.S. 171, 178, 103 S. Ct. 1702 (1983).

The United States Supreme Court has ruled that the First Amendment does not guarantee access to property for all forms of speech simply because it is owned or controlled by the government. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S. Ct. 2701, 2705 (1992). "Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will".... and "is not transformed into 'public forum' property merely because the public is permitted to freely enter and leave the grounds at practically all times and the public is admitted to the building during specified hours." *Grace*, 461 U.S. at 177-178, 103 S. Ct. at 1707. Nonpublic forums include military bases, postal sidewalks, jailhouse grounds, national cemeteries, public hospitals, and

sports complexes. See *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211 (1976) (military base is nonpublic forum); *United States v. Kokinda*, 497 U.S. 720, 110 S. Ct. 3115 (1990) (postal sidewalk is nonpublic forum); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242 (1966) (jail grounds not dedicated for public use); *Lee*, 505 U.S. at 678, 112 S.Ct. at 2705 (airport terminal not a public forum, prohibition against religious solicitation reasonable); and *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.,* 691 F.2d 155, 161 (3d Cir. 1982) (Meadowlands sports complex is nonpublic forum).

The factors the courts look at to determine whether public property is a public forum or, conversely, a nonpublic forum, is: (1) whether a "principal purpose" of the property is to provide for the free exchange of ideas, (2) whether the property shares the characteristics of a traditional public forum, and (3) the historical use of the property. *Lee,* 505 U.S. at 694, 112 S. Ct. at 2716; *Bowman v. White*, 444 F.3d 967, 975 (8th Cir. 2006). An analysis of all of these factors reveals that the Plaza Area at the Arena was clearly a nonpublic forum subject to less stringent First Amendment requirements.

A. **The Plaza Area of the Arena does not share the characteristics of a traditional public forum.**

When examining whether a plaza or commons should be treated as a public sidewalk based on its characteristics, the United States Supreme Court case of *United States v. Grace*, 461 U.S. 171, 103 S. Ct. 1702 (1983) and a recent case from the D.C. Circuit, *Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. Aug. 28, 2015), provide in-depth discussion analyzing how the sidewalks and the commons at the United States Supreme Court building are distinguishable.

*Grace* focused on whether the sidewalk surrounding the Supreme Court building could be restricted despite First Amendment protections. *Grace* held that a federal law prohibiting parades, processions or assemblages (the "Assemblages Clause") and display of flags, banners, or other devices (the "Display Clause") in the Supreme Court Building or grounds was

unconstitutional only to the extent it restricted use of the public sidewalks. The U. S. Supreme Court made clear in its decision that its opinion only pertained to public sidewalks, stating "we shall address only whether the proscriptions of § 13k are constitutional as applied to the public sidewalks," *Grace*, 461 U.S. at 175, 103 S. Ct. at 1706. But with regard to the Supreme Court building and plaza, the Court clarified:

> It is argued that the **Supreme Court building and grounds** fit neatly within the description of non-public forum property. Although the property is publicly owned, it has not been traditionally held open for the use of the public for expressive activities. As *Greer v. Spock, supra,* teaches, the property is not transformed into "public forum" property merely because the public is permitted to freely enter and leave the grounds at practically all times and the public is admitted to the building during specified hours.

*Grace*, 461 U.S. at 178, 103 S. Ct. at 1707 (emphasis added). In distinguishing the public sidewalks surrounding the Supreme Court building and grounds, the Court noted "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180, 103 S. Ct. at 1708. In short, "[t]here is nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds or are in any way different from other public sidewalks in the city." *Id.* at 183, 103 S. Ct. at 1710. The Court affirmed that the portion of the federal statutes pertaining to public sidewalks was unconstitutional.

The issue of whether the Supreme Court building plaza was a nonpublic forum was left unresolved, until it was taken up more than thirty years later in 2015 by *Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. Aug. 28, 2015). The recent decision by the D.C. Circuit Court of Appeals, decided since this Court's Order on the preliminary injunction, took up the issue of whether the Supreme Court plaza was subject to the same First Amendment protections as the public sidewalk in *Grace* and ultimately held that the plaza was a nonpublic forum subject to reasonable time, place, and manner restrictions. *Hodge*, 799 F.3d at 1158. Since the *Grace*

decision, the Supreme Court Police had ceased enforcement of both the Display and Assemblages Clauses on the perimeter sidewalks but continued to enforce both Clauses of the federal law within the Court's plaza. *Id.* at 1154. The plaintiff in *Hodge* was cited for standing in the plaza approximately 100 feet from the Supreme Court building's front doors with a 2 foot by 3 foot sign around his neck after he was given at least three warnings. *Id.*

The D.C. Circuit Court stated "*Grace's* analysis makes evident that the Supreme Court plaza, in contrast to the perimeter sidewalks, is a nonpublic forum." *Id.* at 1158. The court found the plaza was a nonpublic forum due to the fact that it is distinguishable from the perimeter sidewalks through its elevation by marble steps and a low patterned marble wall that is used to define the boundary and indicates one is entering into a special type of enclave, as contrasted with the concrete sidewalk. *Id.* at 1158. All of the distinctive characteristics "indicate to the public that the plaza is an integral part of those grounds." *Id.* at 1159. The D.C. Circuit Court determined the plaza was a nonpublic forum based on its appearance and design and separation from surrounding areas.

The physical characteristics of the Plaza Area, like the Supreme Court plaza in *Grace* and *Hodge*, reveal that there was no intent to provide a traditional public forum for expressive activity. Although the features are not as dominant or preeminent as the raised marble plaza leading into the Supreme Court building, the Plaza Area is marked with easily viewed landmarks such as cement planters, metal stanchions or bollards, and distinctly colored concrete. (Aff. Kirkpatrick, ¶ 8 (Doc. #56-2, at CM/ECF p. 2); Aff. Lorenz, ¶ 6, Ex. A (Doc. #56-3, at CM/ECF p. 2); (Doc. #13-2, at CM/ECF p. 4-17)) The Policy draws an orange line where the boundaries of the Plaza Area can be easily determined. (Doc. #13-2, at CM/ECF p. 6-15); Aff. Lorenz, Ex. A (Doc. #56-3, at CM/ECF p. 5-17) Similar to *Hodge*, the Plaza Area relies upon a different color and material for its pavement and the low walls of the planters to delineate where the Plaza

Area is positioned. As this Court found during the preliminary injunction proceedings, "the boundary elements combined with the size, shape, and general appearance of the Plaza Area serve to distinguish it from the adjacent public sidewalk." (Doc. #24, at CM/ECF p. 12)

The Plaza Area cannot reasonably be confused with the public sidewalk adjacent to "R" Street running east to west, just to the south of the Arena. The "R" Street sidewalk is "indistinguishable" from any other sidewalks in Lincoln, Nebraska. See *Grace*, 461 U.S. at 179, 103 S. Ct. at 1708. Sidewalks are perennially a set width, run parallel to and border the public right-of-way streets, and blend into the urban or transportation grid as a public thoroughfare, as the sidewalk does outside the Plaza Area. See *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 452 (6th Cir. 2004) (the "Gateway Sidewalk blends into the urban grid, borders the road, and looks just like any public sidewalk"). See, also for comparison, *Lewis v. Colo. Rockies Baseball Club*, 941 P.2d 266, 274 (Colo. 1997) ("sidewalks and walkways surrounding Coors Field were specifically designed to be integrated into downtown Denver's street grid. As such, the sidewalks are not used solely for ingress and egress to the stadium but connect with, and essentially function in the same manner as, the municipal sidewalks throughout the downtown area.")

In contrast, the space within the Plaza Area, demarcated by its curved rather than straight boundary, the bollards and cement planters encircling the entry to the Arena, complete with darker-colored concrete, has distinguishing characteristics and is not similar to a traditional sidewalk. *Greater Cleveland, Inc.*, 383 F.3d at 453 (commons within sports complex is nonpublic forum despite use by radio stations or access by ticketholders). The Plaza Area is equivalent to the plaza in front of the Lincoln Center performing arts complex in *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 550 (2d Cir. 2002), "although the Plaza connects with walkways leading to surrounding

streets, it does not form part of the City's transportation grid in the way that traditional streets and sidewalks do." See also *Hodge*, 799 F.3d at 1159-60. A clear division exists between the "R" Street sidewalk and the Plaza Area based on appearance and design. Simply because the Plaza Area is outdoors and adjacent to the "R" Street sidewalk does not mean that it should be deemed a sidewalk or traditional public forum. The extensive analyses in both *Grace* and *Hodge* support a finding that the physical characteristics of the Plaza Area reveal it to be a nonpublic forum. For this reason, the Court should find that the Plaza Area is not a traditional public forum due to its distinctive, easily visible characteristics.

**B.    The principal purpose of the Plaza Area is for use of tenants of the Arena, not for expressive activities by the public.**

The Plaza Area should also not be construed as a traditional public forum, because the principal purpose for the Plaza Area is for use by tenants of the Arena, not for expressive activities by the public. The United States Supreme Court in *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 679-80, 112 S. Ct. 2701, 2706 (1992), in its analysis concluding that airport terminals are not public fora due to their purpose of facilitating passenger air travel, stated:

> consistent with the notion that the government -- like other property owners -- "has power to preserve the property under its control for the use to which it is lawfully dedicated," the government does not create a public forum by inaction. Nor is a public forum created "whenever members of the public are permitted freely to visit a place owned or operated by the Government." The decision to create a public forum must instead be made "by intentionally opening a nontraditional forum for public discourse." Finally, **we have recognized that the location of property also has bearing because separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction.** [Citations omitted, emphasis added.]

If a governmental entity dedicates a new area or property for a purpose other than expressive activity, such as for commercial or exclusive governmental purposes, even though members of the public are allowed to visit the area, the property still remains dedicated for those other principal purposes.

Several other cases have provided in-depth analysis into the purpose of the property where the expressive activity is being challenged and used that analysis to find a lack of public forum. In *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 552 (2d Cir. 2002), which involved a plaza in the center of Lincoln Center performing arts complex in Manhattan, New York, the Second Circuit Court of Appeals determined it was not traditional public forum, stating that "consideration of the relevant factors, *i.e.*, the Plaza's location, use, function, and purpose, together with the City's intent in building the space, demonstrates that permitting all forms of expressive activity in the Plaza would be incompatible with its **'intended purpose'**…to establish a specialize space devoted to contemplation and celebration of the arts" (emphasis added). See also *Families Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.*, 111 F.3d 1408, 1419 (8th Cir. 1997) (the principal purpose of the lobby of the local Nebraska Department of Social Services was not for free exchange of ideas, but to provide a variety of services to welfare recipients; therefore, the lobby was a nonpublic forum); *Hubbard Broad., Inc. v. Metro. Sports Facilities Com.*, 797 F.2d 552, 555 (8th Cir. 1986) (Metrodome's principal purpose was as a sports complex and commercial venture, not to provide expressive opportunities, even if some advertising was permitted; city did not create public forum); *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 160-161 (3d Cir. 1982) (purpose of Meadowlands sports complex not for expressive activity).

The Plaza Area for the Arena is equivalent to the plaza entering the Arena at Harbor Yard in Bridgeport, Connecticut in the case of *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205 (D. Conn. 2011). Like the Plaza Area outside the entrances to the Arena in the case at hand, "[t]he evidence indicates that the plaza was intended to be and is used primarily by patrons for the purpose of entering and exiting the Arena before and after performances held

inside." *Bridgeport*, 833 F. Supp. 2d at 213. The forecourt of the arena in *Bridgeport* was also used as a "security screening area and entranceway for large crowds of patrons attending performances at the Arena," *Id.* at 214. Similarly, the Plaza Area at the City's Arena is also used as a security screening area. (Aff. Lorenz, ¶ 9 (Doc. #56-3, at CM/ECF p. 2-3); Depo. Lorenz, 22:8-13 (Doc. #56-4, at CM/ECF p. 8); Depo. Lorenz, 28:17-22, 30:7-20 (Doc. #56-4, at CM/ECF p. 10)) Further, "the evidence indicates that people ordinarily would not visit the plaza unless they intend to enter the Arena to view a performance inside." *Id.* at 214. (Doc. #24, at CM/ECF p. 10) All of these factors found in *Bridgeport* that led to its classification of the plaza as a nonpublic or limited public forum can be found here with the Plaza Area at the Arena.

The design and construction of the Arena and Plaza Area was not to provide the public with an area for a free exchange of ideas and free expression, but rather for operating a sports/entertainment arena for sporting events, University basketball games, concerts, and for other commercial purposes. (Doc. #1-6, at CM/ECF p. 6); (Doc. #1-4, at CM/ECF p. 1); Aff. Kirkpatrick, ¶ 2 (Doc. 56-2, at CM/ECF p. 1) The Plaza Area is reserved for use by tenants and/or the artists or productions they represent as the Plaza Area is considered a space included in the tenants/artists' lease of the facility. (Aff. Lorenz, ¶ 7 (Doc. #56-3, at CM/ECF p. 2)) The Policy allows the full use of the Arena for tenants, shows, and exhibits and to protect the area in front of main doors for use by shows. (Aff. Lorenz, ¶ 7 (Doc. #56-3, at CM/ECF p. 2)) For example, during the Paul McCartney concert, the Plaza Area was used to sell concert souvenirs as well as to hold a mock red British phone booth for people to use in pictures. (*Id.*) The Plaza Area would also be useful as an exhibit area for trade RV and boat shows. (*Id.*)

The Policy is similar to one that was used for many years by SMG at the Pershing Center, which was designed to allow for safe and efficient access to the facility by patrons. (Aff. Lorenz, ¶ 4 (Doc. #56-3, at CM/ECF p. 1)) Another principal purpose of the Policy is to ensure safety

and crowd management of the Plaza Area. The Plaza Area outside the Arena entrances is used by patrons to enter and exit the Arena before and after performances and sporting events, which can includes crowds up to 12,000 to 15,000 for a single event, and is sometimes used as a security screening area as well. (Aff. Lorenz, ¶ 9 (Doc. #56-3, at CM/ECF p. 2-3); Depo. Lorenz, 22:8-13 (Doc. #56-4, at CM/ECF p. 8); Depo. Lorenz, 28:17-22, 30:7-20 (Doc. #56-4, at CM/ECF p. 10); (Doc. #24, at CM/ECF p. 2)) When managing crowds or dealing with known security risks, under the Policy the Plaza Area can be managed to ensure those issues can be dealt with in an efficient and safe manner. (Doc. #24, at CM/ECF p. 19)

The Policy designates certain areas of the Arena's "walkways, steps, verandas, terraces, access ramps, parking lots, loading ramps, the Arena Festival Space/parking lot, and the Arena premium parking garage" as "non-public forum exterior Arena areas." (Aff. Lorenz (Doc. #56-3, at CM/ECF p. 5)) These areas "extend out to the public sidewalk perimeter" but do not include the sidewalk, as shown on Attachment "A" to the Policy that marks the nonpublic forum areas. (*Id.*) "Charitable solicitations" and "[l]eafleting, signature gathering, promotional material distribution, merchandise sales, and picketing" are only allowed in the Arena and other nonpublic forum areas "at the request of a Tenant, the Tenant's contractual entity and/or the artists or productions, they represent." (*Id.*) SMG enacted the Policy with First Amendment protections in mind by excluding sidewalks from any restrictions and clearly designating what areas were nonpublic fora, which in this case is the Plaza Area. (Aff. Lorenz, ¶¶ 10-11 (Doc. #56-3, at CM/ECF p. 2))

The undisputed material evidence shows the City's and SMG's intended purposes of the Plaza Area were for uses by tenants and productions and for safety and crowd management. The evidence does not in any way indicate there was any intention to open up the Plaza Area as a new venue for expressive use by the public, to be used in addition to the sidewalks which run

adjacent to the Arena property. Based on the City's and SMG's intentions and uses, the Plaza Area should be deemed a nonpublic forum.

**C.     Lack of historical use of Plaza Area supports a finding of a nonpublic forum.**

The final factor to consider in whether a Plaza Area is a public or nonpublic forum is the historical use of the property. "The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." *Bowman v. White*, 444 F.3d 967, 985 (8th Cir. 2006) (Bye concurring opinion, quotation removed). The U. S. Supreme Court has stated that it "'rejected the view that traditional public forum status extends beyond its historic confines.' *Forbes*, *supra,* at 678, 141 L. Ed. 2d 500, 118 S. Ct. 2168. The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking." *United States v. Am. Library Ass'n*, 539 U.S. 194, 206, 123 S. Ct. 2297, 2305 (2003) (library's filtering software was not restraint on speech, absent history that internet was "held in trust for the use of public").

One example in which the courts analyzed the historical nature of the property was in the case of *Venetian Casino Resort, L.L.C. v. Local Joint Executive Bd. of Las Vegas*, 257 F.3d 937, 943 (9th Cir. 2001). Due to the widening of Las Vegas Boulevard, a replacement sidewalk was constructed in front of the Venetian Casino Resort on its private property to connect the public sidewalk on either side of the property. 257 F.3d at 939. An agreement between the Venetian and State of Nevada Department of Transportation provided the new sidewalk in front of the Venetian would be a private sidewalk. *Id.* at 940. After a demonstration was held on the private sidewalk, the Venetian sought a declaratory judgment that the Venetian sidewalk was a nonpublic forum. *Id.* at 940-41. The District Court and Ninth Circuit Court of Appeals found that the sidewalk in front of the Venetian had historically been a public forum, that the relocation did not alter the character or its use by the public, that the "private sidewalk" was indistinguishable from the public sidewalk on either

side, and that the dedication for public use all supported a finding that the Venetian's sidewalk was a traditional public forum. *Id.* at 947. The Ninth Circuit extensively considered the history of the sidewalk and found that "[i]t is the historical use of the sidewalk adjacent to Las Vegas Boulevard that is significant." *Id.* at 944.

In this case, the new roads, streets, sidewalks, and Plaza Area constructed adjacent to the Arena did not exist prior to construction of the Arena, as the area previously consisted of railroad tracks for BNSF and Amtrak that were relocated further to the west to accommodate the construction of the Arena. (Aff. Kirkpatrick, ¶ 4 (Doc. #56-2, at CM/ECF p. 2)) There was no historical use of the Plaza Area adjacent to the Arena, because the Plaza Area did not exist; all of it was constructed and completed in 2013. From the time the Arena doors opened in fall of 2013, SMG had adopted a policy that governed use of the Plaza Area and restricted it to use by tenants of the Arena. (Aff. Lorenz, ¶¶ 3-4 (Doc. #56-3, at CM/ECF p. 1) The historical roots of the policy was the policy SMG had employed when operating the Pershing Center. (*Id.*) Although the "R" Street sidewalk was dedicated for public use once constructed, the Plaza Area was not. (Aff. Lorenz (Doc. #56-3, at CM/ECF p. 5)) A plaza or commons entering a building that is differentiated from the sidewalk has not historically been viewed as one protected as a traditional public forum. See, e.g., *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205, 214 (D. Conn. 2011) (plaza outside of Arena at Harbor Yard not historically used for expressive activity) and *Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534 (2d Cir. 2002) (plaza outside arts complex not historically protected). Based on case law viewing what locales are typically found to be traditional public forums, the Plaza Area outside the Arena does not fall within any of those historically protected domains, which is further evidence it should be considered a nonpublic forum for purposes of analyzing Plaintiff's First Amendment rights.

**II.**    <u>**The SMG Policy is a reasonable restriction upon expressive activities.**</u>

As discussed in City's previous brief on the preliminary injunction, the nature of the forum of government property affects how the courts analyze any speech restrictions placed upon the property. (Doc. #14, at CM/ECF p. 11-12) Even in a public forum, the government "may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753 (1989), quoting *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069 (1984). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791, 109 S. Ct. at 2754. See also *Berger v. City of Seattle*, 512 F.3d 582, 591-92 (9th Cir. 2008) ("a rule does not discriminate based on content simply because it restricts a certain 'medium' of communication").

In this case, where the undisputed, material factual evidence points to the Plaza Area being a nonpublic forum, the Policy should be viewed based on the reasonableness of the restrictions imposed on Plaintiff's expressive activity. In a nonpublic forum, the government may "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955 (1983). See also *Hotel Employees*, 311 F.3d at 546 ("government may restrict speech in non-public forum subject only to the requirements of reasonableness and viewpoint neutrality"). "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only

reasonable limitation." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 808, 105 S. Ct. 3439, 3452 (1985) (Combined Federal Campaign charity drive was nonpublic forum requiring reasonable restrictions).

The Court has already determined the undisputed fact that the Policy is content neutral (Doc. #24, at CM/ECF p. 19), so the remaining analysis pertains to whether the restrictions in the Policy are reasonable. The City's position on the reasonableness of the Policy for designating the Plaza Area and other areas as nonpublic forum is supported by the Third Circuit Court of Appeals decision in a case involving another arena sports venue, *Int'l Soc. for Krishna Consciousness, Inc. v. New Jersey Sports & Exposition Auth.*, 691 F.2d 155, 161-62 (3d Cir. 1982). The case was brought by the International Society for Krishna Consciousness, Inc. (ISKCON), in response to the refusal by the New Jersey Sports Authority to allow ISKCON to distribute literature and solicit donations at the Meadowlands sports complex. In finding the policy limiting this expressive activity was reasonable, the Court noted the distribution of printed material and solicitation can have adverse effects on concessionaire business, subjects patrons to unwanted intrusion, and impedes crowd movement. *Id.* at 162. The Court went on to find the Meadowlands policy banning expressive activity was reasonable, because it was tailored to address concerns relating to the operation of the sports complex.

Similarly, SMG's Policy is reasonable in that it serves many of the same purposes by preventing competing sales and solicitation near the entrances to the Arena and assists with crowd control of those seeking to enter the Arena. The Plaza Area outside the Arena entrances is used by patrons to enter and exit the Arena before and after performances and sporting events and is sometimes used as a security screening area as well. (Aff. Lorenz, ¶ 9 (Doc. #56-3, at CM/ECF p. 2-3); Depo. Lorenz, 22:8-13 (Doc. #56-4, at CM/ECF p. 8)) The Plaza Area is also used for commercial purposes, such as selling souvenirs and for an exhibit area for shows. (Aff.

Lorenz, ¶ 7 (Doc. #56-3, at CM/ECF p. 2)) The restrictions on designating the Plaza Area as a nonpublic forum logically further these purposes and are reasonable in breadth. See *Hodge*, 799 F.3d at 1163 (Supreme Court plaza "is an area in which the government may legitimately attempt to maintain suitable decorum for a courthouse"). The undisputed material facts show that the Policy is reasonable in scope and should be held to be constitutional as not unduly restrictive of the public's or Plaintiff's First Amendment rights.

Even under a strict scrutiny analysis for First Amendment rights, similar to *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753, Plaintiff's rights have not been infringed. City and SMG have a significant government interest of facilitating contractual relationships with tenants, reserving the Plaza Area for those tenants, and preserving the Plaza Area as an area free of congestion to allow for unimpeded and easy ingress and egress into the Arena for events. As discussed below, ample alternative channels exist for Plaintiff to engage in his expressive conduct. The restrictions designating the area of nonpublic forum in the Policy are narrowly tailed by allowing use of the walkways and the obvious traditional public forum of the sidewalk adjacent to "R" Street. When judged against either the reasonableness standard for a nonpublic forum or the stricter scrutiny for a more public forum, the Policy satisfies both analyses and must be found valid as not violating Plaintiff's or others' constitutional rights under the First Amendment.

**III.** **Plaintiff had ample opportunity to conduct his expressive activity on the sidewalk adjacent to the Plaza Area, was not prevented from doing so, was asked to move to the sidewalk, but chose to leaflet on the Plaza Area in order to "challenge" the Policy.**

SMG's Policy does not unconstitutionally infringe on Plaintiff's First Amendment rights, because Plaintiff is permitted to exercise those same expressive rights on the sidewalks and walkways surrounding the Arena. Plaintiff had been asked on multiple occasions to move to the adjacent "R" Street sidewalk south of the Arena property, in order to continue his leafleting and expressive activities. (Depo. Lorenz, 54:20-55:11 (Doc. #56-4, at CM/ECF p. 16)); Aff. Lorenz, ¶

21 (Doc. #56-3, at CM/ECF p. 4)) In fact, Plaintiff knew that the written Policy had been adopted prior to coming to the Arena and leafleting in March 2015 and had even read it on the internet. (Depo. Lorenz, 26:22-24 (Doc. #56-4, at CM/ECF p. 9); Depo. Lorenz, 54:20-55:11 (Doc. #56-4, at CM/ECF p. 16); Depo. Ball, 60:19-61:14 (Doc. #56-5, at CM/ECF p. 16-17); Depo. Ball, 87:15-88:11 (Doc. #56-5 at CM/ECF p. 23); Aff. Lorenz, ¶ 19 (Doc. #56-3, at CM/ECF p. 4)) Nevertheless, Plaintiff chose to remain in the Plaza Area, approximately 25 feet from the Arena doors, in order to challenge the Policy that SMG had instituted. (Depo. Ball, 58:5-21 (Doc. #56-5, at CM/ECF p. 16); Depo. Ball, 63:10-64:10 (Doc. #56-5, at CM/ECF p. 17); Depo. Ball, 93:16-23 (Doc. #56-5, at CM/ECF p. 25); Depo. Ball, Ex. 15 (Doc. #56-5, at CM/ECF p. 42); Aff. Lorenz, ¶ 17 (Doc. #56-3, at CM/ECF p. 3-4); (Doc. #13-1, at CM/ECF p. 12-13))

As discussed in the immediate section above, a governmental party, or in this case SMG on behalf of City, may impose reasonable restrictions on speech if those restrictions also "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791, 109 S. Ct. at 2753 (1989). "The reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 335 (8th Cir. 2011) (citation omitted). The case of *Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) is helpful in explaining what measures do allow for ample alternative channels of expression. In *Manchester*, the Eighth Circuit Court of Appeals held an amended ordinance enacted by the City of Manchester barring picketing and protesting within 300 feet of any funerals and burials for one hour before and after was a constitutionally permissible regulation of speech. The Eighth Circuit focused on the fact that the 300 feet was not a floating zone, was regulated only a short period of time, and did not restrict the number of speakers, noise level, or placards used in

determining the ordinance was narrowly tailored. *Manchester*, 697 F.3d at 694. Further, the Manchester ordinance left "ample alternative channels" in that "[d]issemination of a message by letters to the editor or the internet is also possible….Otherwise individuals may picket in Manchester wherever and whenever they desire. Speakers retain great latitude to express any viewpoint or discuss any topic at nearly any location and nearly any time in the city of Manchester." *Id.* at 695. See also *Phelps-Roper v. Koster*, 713 F.3d 942, 954 (8th Cir. 2013) (Missouri statute Section 578.502, virtually identical to Manchester, MO ordinance, leaves ample alternative channels and is constitutional).

      Other cases before the Eighth Circuit and U.S. Supreme Court also elaborate on what alternative means for expression might be. See *Hill v. Colorado*, 530 U.S. 703, 726, 120 S. Ct. 2480, 2494 (2000) (law providing for an 8 feet buffer zone from another person at health care facility upheld, "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal"); *Thorburn v. Austin*, 231 F.3d 1114, 1119-20 (8th Cir. 2000) (Lincoln ordinance prohibiting residential picketing within 50 feet of the property except on the sidewalk on the opposite side of the street from the targeted dwelling was held to be constitutional, alternatives included organizing a march in neighborhood, distributing literature or collecting signatures on petitions door-to-door, or picketing across the street); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 819, 104 S. Ct. 2118, 2136 (1984) (ordinance prohibiting posting of signs on public property left open ample alternative avenues of communication, such as posting of signs on private property and the distribution of handbills); *Olmer v. City of Lincoln*, 192 F.3d 1176, 1187 (8th Cir. 1999) (Lincoln ordinance prohibiting focused picketing through banners, placards, and signs on religious premises on adjacent sidewalks during religious activities within one-half hour of activity allowed ample

alternatives for distribution of literature or protesting on streets); *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567, 92 S. Ct. 2219, 2228 (1972) (shopping mall did not violate First Amendment by prohibiting leafleting, alternative avenues for distribution on sidewalk outside). Cf. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 122 S. Ct. 2080 (2002) (required permit for all canvassers going to residences, even for noncommercial causes, violated the First Amendment). "Rarely will a nonpublic forum provide the only means of contact with a particular audience." *Cornelius*, 473 U.S. at 809, 105 S. Ct. at 3452.

In this case, Plaintiff had ample alternative means to communicate his message. He could engage in leafleting, a march, or picketing on the sidewalk a mere 15 to 20 feet from where he was originally arrested. In fact, Arena staff and LPD police officers offered the alternative of moving to the sidewalk mere feet away to Plaintiff several times on each occasion before he was ultimately cited for trespassing. (Depo. Lorenz, 26:22-24 (Doc. #56-4, at CM/ECF p. 9); Depo. Lorenz, 54:20-55:11 (Doc. #56-4, at CM/ECF p. 16); Depo. Ball, 66:21-67:23 (Doc. #56-5, at CM/ECF p. 18); Aff. Lorenz, ¶ 21 (Doc. #56-3, at CM/ECF p. 4)) The sidewalk provides an abundant area to the south and east of the Arena for Plaintiff to engage in leafleting to reach the public. In fact, a demonstration of 50-60 people performing a "die-in" was easily accommodated on the sidewalk adjacent to the Plaza Area. (Aff. Lorenz, ¶ 10 (Doc. #56-3, at CM/ECF p. 3)) As stated so succinctly in *Hodge*, the "statute's reasonableness is reinforced by the availability of an alternative site for expressive activity in the immediate vicinity: the sidewalk area directly in front of the Court's plaza." 799 F.3d at 1150.

The parties agree that the sidewalk is a traditional public forum for First Amendment rights. What the parties disagree about is whether the Policy establishing a nonpublic forum for the Plaza Area subject to restrictions that differentiate it from the surrounding sidewalks is constitutionally valid in those restrictions. Sidewalks are traditional public fora where Plaintiff is entitled and was in fact asked to continue his First Amendment expressive activity upon. Plaintiff

even undertook leafleting on the sidewalk outside the Plaza Area during boys state basketball the second weekend of March 2015 with no contact by either SMG or Lincoln Police Department. (Aff. Lorenz, ¶ 20 (Doc. #56-3, at CM/ECF p. 4)) Plaintiff's First Amendment rights were not obstructed. He was, and is, fully able to distribute his religious pamphlets on the sidewalks surrounding the Arena to the attending public. There can be no dispute that Plaintiff had ample alternatives to continue his leafleting or engage in other expressive activity to proselytize his religious message to the public. Therefore, SMG's Policy was not unconstitutional on its face or as applied to Plaintiff as restricting First Amendment rights.

<u>**CONCLUSION**</u>

The parties are not expected to differ much in their presentation of the facts to the Court. There is truly no dispute of material fact about the design and construction of the Arena with the Plaza Area and the adjacent sidewalk, SMG's intent to reserve use of the Plaza Area for tenants similar to its past practice at the Pershing Center, SMG's adoption of the Policy, Plaintiff's leafleting on the Plaza Area on three separate occurrences, the location of Plaintiff's leafleting on the Plaza Area on each of the three occurrences, Plaintiff's citations for those three occurrences, and Plaintiff's knowledge of and deliberate disregard for the Policy for the two occurrences in March 2015. The main factual dispute expected to be presented by Plaintiff is the alleged intent of City and JPA to permit public use of the Plaza Area when the West Haymarket and Arena was being developed and designed; however, such evidence simply does not exist and is, furthermore, not overly relevant to the Arena's actual operation by SMG after its selection as facilities manager in 2012 prior to the Arena being finished and opening. (Doc. #1-6); Aff. Lorenz, ¶ 2 (Doc. #56-3, at CM/ECF p. 1)

This Court has already determined on the preliminary injunction that Plaintiff was not likely to succeed on his First Amendment claims. When the material facts are viewed in the light

most favorable to Plaintiff, the evidence shows City is entitled summary judgment on the entirety of those same First Amendment claims asserted by Plaintiff. Therefore, Defendant City of Lincoln respectfully requests that the Court reaffirm its prior decision and determine that summary judgment is appropriate and necessary as a matter of law on all Plaintiff's claims in his Complaint and enter an Order to that effect.

DATED: April 15, 2016.

CITY OF LINCOLN, NEBRASKA, Defendant

By: */s/ Jocelyn W. Golden*
  Jeffery R. Kirkpatrick, #21280
  Jocelyn W. Golden, #23039
  555 South 10th Street, Suite 300
  Lincoln, NE 68508
  Phone: (402) 441-7281
  E-mail: jgolden@lincoln.ne.gov
     jkirkpatrick@lincoln.ne.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Thomas White, twhite@whitejorgensen.com; Amy Miller, amiller@aclunebraska.org; Amy Jorgensen, ajorgensen@whitejorgensen.com; Brian Nolan, bnolan@nolanolson.com; and Leslie Stryker, lstryker@nolanolson.com.

By: */s/ Jocelyn W. Golden*
  Jocelyn W. Golden, #23039