IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LARRY M. BALL, | ) | CASE NO:8:15CV95 |
| | ) | |
| Plaintiff, | ) | |
| | ) | PLAINTIFF'S BRIEF IN OPPOSITION |
| v. | ) | TO DEFENDANTS' MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| CITY OF LINCOLN, | ) | |
| and SMG, a Pennsylvania General | ) | |
| Partnership, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW, the Plaintiff, Larry M. Ball, by and through his attorneys of record, and submits his Brief in Opposition to Defendants' Motion for Summary Judgment.

## **INTRODUCTION**

This First Amendment case through discovery is now on far different footing than the matter presented to the Court for a preliminary injunction. Unlike the injunction hearing there now are clear admissions made by the SMG manager, Tom Lorenz, establishing that content censorship exists in the disputed area. In addition, the area where Plaintiff was handing out leaflets with a Gospel passage is always open to members of the public even during events at the arena using the Plaza, to enter stop, gather and discuss politics, or just where to eat.

It is admitted that the area in question is at all times open to all members of the public not just customers of the arena.

It is admitted that non customer's can gather and discuss whatever they wish, however: A Christian "might be allowed to preach" at this site.

> Q. Okay. And this is an area where various pedestrians coming from the festival parking lot or the Saltdogs might stop and look at that sign to decide where they want to go into the city?
> A. They might.

Q. So it's (the plaza area near the sign) a regular area used by the public for purposes other than entrance into the Pinnacle Arena?

A. It can be. It's not directly on, though, with your example earlier of people coming from the Saltdogs. They would head more straight towards The Railyard, which is, obviously, directly across there. But they could go to the sign.

Q. Well, the sign is an attraction saying, "Come here. Here is what's coming up." So any curious pedestrian would want to sit and read directional signs? It's meant to gather people, right?

A. It's meant to give direction. I can't speak to whether it draws other people in or how much, you know, people would be drawn to it or go out of their way to get to it.

Q. And if somebody, for whatever reason, during entrance or exit from a concert that was up towards the Saltdogs came down that ramp and went over to look at where he could go for direction, would he be in violation of SMG's policy?

A. As long as they weren't doing any of the activities that are in our policy, they would not be in violation of that area.

Q. Okay. So it's – their right to be there is clear? It's – what your controlling is they don't have the right to speak out about their cause, whether it's religion or something else? That violates the policy, not their presence, but the speaking out about their cause?

A. The activities that we cover would be, you know, selling material, selling T-shirts that weren't authorized, you know, within – as part of the production, food, those types of things.

And so there's multiple activities, and the policy was not directed and had no bearing on whether he was handing out religious material or not.

Q. Well, wait a minute.

Could he just stand there and preach if he didn't hand out pamphlets?

A. I don't know the answer to that.

(Def. Exh. 4 - Lorenz Depo: 55:12-57:9)

Political leaflets on issues favored by Neil Young can be handed out but Christians'

leafleting are liable to be arrested.

Q. I'm thinking, oh, Neil Young?

A. Neil had a series of tents, and he had some things that were politically important to him as part of their production and part of their setup.

Q. Okay. Just – we'll work the question. Did Neil Young and did SMG permit

Neil Young to have political messages in the area it excludes Mr. Ball from?

A. Yes (Def. Exh. 4 - Lorenz Depo: 24:9-17)

This case must now be viewed under the highest or strict scrutiny standard. *Reed v. Town of Gilbert Arizona*, 135 S.Ct. 2218 (2015).

It is also admitted that the Plaintiff never caused congestion or posed a security threat and permitted activities proved far more likely to impede entrance and egress. In short safety and security have nothing to do with the policy.

**STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

It has been long recognized that the more important the rights at issues in a case, the more searching must be the Court's scrutiny of the record. "To prevail on a motion for summary judgment, the moving party must assume the burden of proving that there are no disputed issues of material fact and that it is entitled to judgment on all matters of law. Fed.R.Civ.P. 56(c). See 6 Moore, Federal Practice ¶56.15 [3] (2nd Ed. 1971). Moreover, in cases raising federal constitutional claims, a court must rigorously insure against granting summary judgment when any doubt exists concerning disputed material facts. See *Sindermann v. Perry,* 430 F.2d 939, 943 (5th Cir. 1970)." *Boulware v. Battaglia*, 344 F. Supp. 889, 892-93 (D. Del. 1972) aff'd, 478 F.2d 1398 (3d Cir. 1973). On a motion for summary judgment, this court must examine all the "pleading, depositions, answers to interrogatories...admissions on file...{and} affidavits." Fed.R.Civ.P.56(c). The question before the court is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995). Summary judgment is only proper when the record

shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fast v. Southern Union Co., Inc.*, 149 F.3d 885,889 (8th Cir. 1998). "'At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. Rather, the court's function is to determine whether a dispute about material fact is genuine.'" *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998) (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

"{A} genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Id*. (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). Any inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Krenik v. County of Le Sueur*, 47 F.3d 953 (8th Cir. 1995), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Courts have noted that when the stakes are high, and important Constitutional rights are implicated, the courts examination of the record ought to be particularly exacting. "Besides being subject to the normally stringent prerequisites for the granting of summary relief, plaintiffs bear an added burden because of the important constitutional questions involved in this case. Although summary judgment motions are never to be granted on the basis of inadequate and controverted factual records, where constitutional issues of large public import are involved, the Court's scrutiny of the record, to ensure that there are no disputed issues of material fact, must be particularly exacting." *Pettinaro Const. Co., Inc. v. Delaware Auth. for Reg'l Transit*, 500 F. Supp. 559, 563 (D. Del. 1980).

In this case Free Speech is threatened by the actions of the Defendants City of Lincoln and SMG. Additionally the City and SMG, a management company responsible for many public spaces nationally, have threatened the integrity of public forums within the City of Lincoln. This case raises issues which are of "large public Import" *Id.* Therefore this Court's search for issues of material fact must be particularly exacting.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

As both City of Lincoln and SMG have identical statement of facts, one response will be provided to apply to both Defendant's.

1. Admit

2. Admit

3. Admit

4. Admit all with the exception that the overpass also serves to connect the downtown sidewalk system to the Salt Dogs and Nebraska baseball complex as well as the extensive trail system running through the Metro Area and as far away as Beatrice. (Def. Exh. 5 - Ball Depo: 104:18-107:4)

5. Admit

6. Admit

7. Admit

8. Admit

9. Admit

10. Deny to the extent the alleged policy was not written and therefore "not in place" the first time Plaintiff was arrested. Further the policy is dangerously ambiguous as it allows any

type of speech in the controlled area where Plaintiff was arrested by non customers of the arena; "may allow preaching by Christians", does not allow handing out leaflets with Gospel tracts but does allow leaflets with political views when supported by Neil Young and other entertainers.  (Def. Exh. 4 - Lorenz Depo 24:2-24; 26:9-12; 55:7-58:5; see also Def. Statement of Material Facts #25)

11.     Deny.  The policy does not allow for or even really concern itself with safe passage for arena customers.  **Sales of tee shirts and other goods along with political leaflets are permitted and by admission of the arena manager cause greater congestion than any of the speech or activities of the Plaintiff**.  Further the areas in question are open to and in fact designed for the use of pedestrian foot traffic with no business with the arena.  All of these individuals are welcome to stand, converse, examine the large permanent map of the Haymarket, debate politics or simply argue about where to eat dinner.  This is a quintessential public forum.  The area in question is nothing like the approach walks to the Pershing Center.  (Def. Exh. 4 - Lorenz Depo 53:9-57:9 and 45:12-47:4)

Q. Okay. And this is an area where various pedestrians coming from the festival parking lot or the Saltdogs might stop and look at that sign to decide where they want to go into the city?
A. They might.
Q. So it's (the plaza area near the sign) a regular area used by the public for purposes other than entrance into the Pinnacle Arena?
A. It can be. ... (Def. Exh. 4 - Lorenz Depo: 55:12-20)

12.     Admit

13.     Deny, the Policy does not exclude persons with no business at the arena from entering, standing, speaking in the areas claimed to be for the exclusive use of customers and tenants of the arena.  Nor are these "non public" areas clearly delineated. (Def. Exh. 4 -

Lorenz 53:9-57:17 and 44:1-17).

14.     Deny

15.     Deny. See #11 and 13.

16.     Deny. See #11 & 13.  By its own admission Defendant does not exclude non arena customers from these areas.  In fact the area where Plaintiff was twice arrested has not been used as a security area.  Even when the plaza is used for example to exhibit automobiles or to distribute political tracts casual passerby's who are **not** arena customers are welcome to come into and congregate in the area. At all times the map of the Haymarket area is open to and used by passing individuals who are free to stand, congregate and talk.  Defendant clogs this very area with booths and tables that create for more congestion than any activity of Plaintiff.  The claim of "security and safety" is flatly untrue.

17.     Deny that the area so designated is in any manner a substitute for the space that Defendants admit is open to the public and where Plaintiff was arrested.

18.     Admit Plaintiff passed out religious leaflets in proximity to arena.

19.     Admit Plaintiff was handing out leaflets outside arena.

20.     Deny. Plaintiff was on a sidewalk when leafleting.

21.     Admit

22.     Admit but at all times Plaintiff was on a colored concrete sidewalk open to the public and not just arena customers.

23.     Admit except Plaintiff was at all times on a public sidewalk.

24.     Admit

25.     Admit, but note the inconsistency between allegation here and allegation in # 10, 11 & 12. The policy was "unwritten" but claimed to be "in place", as such it is a mere whim not a policy.

26.     Admit charges were dismissed.

27.     Admit but the Plaintiff was in an area open to all members of the public at all times and not just arena customers.

28.     Admit

29.     Admit

30.     Admit Plaintiff stayed in an area that was open to all members of public, where people could speak to each other, where they "might be able to preach" but where they were barred from handing out religious tracts but other political speech had been permitted.

        (Def. Exh. 4 - Lorenz 55:7-57:17)

31.     Admit

32.     Admit Plaintiff has declined to be barred from a public space and shunted off to a remote spot not visited by most members of the public.

33.     Unknown and irrelevant

34.     Admit

## ARGUMENT

## I.

## THE PLAZA AREA WHERE PLAINTIFF WAS LEAFLETING AND THE OTHER AREAS COVERED BY THE ARENA'S EXTERIOR USE POLICY ARE TRADITIONAL PUBLIC FORUMS.

### A. Once a Traditional Public Forum is Created, the State cannot revert that space into a Non-Public Forum.

The law defining public forums is clear, if an area is a public forum, then the government may not change the public character of that area. By creating an artificial and dogmatic distinction between "sidewalks" and "walkways" or between "sidewalks" and "plazas" the Defendant attempts to create rhetorical distinction where in reality no factual distinctions exist. Such arbitrary redefinition of public forums has been rejected by the courts: "Congress, no more than a suburban township, may not by its own ipse dixit destroy the "public forum" status of streets and parks which have historically been public forums." *U. S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 133 34, 101 S. Ct. 2676, 2687, 69 L. Ed. 2d 517 (1981). Non-customers of the Arena and members of the public are free to stand in the plaza and talk about anything they want.

> Q. And if somebody, for whatever reason, during entrance or exit from a concert that was up towards the Saltdogs came down that ramp and went over to look at where he could go for direction, would he be in violation of SMG's policy?
> A. As long as they weren't doing any of the activities that are in our policy, they would not be in violation of that area.
>
> Q. Okay. So it's – their right to be there is clear? It's – what your controlling is they don't have the right to speak out about their cause, whether it's religion or something else? That violates the policy, not their presence, but the speaking out about their cause?
> A. The activities that we cover would be, you know, selling material, selling T-shirts that weren't authorized, you know, within – as part of the production, food,

those types of things.

     And so there's multiple activities, and the policy was not directed and had no bearing on whether he was handing out religious material or not. (Def. Exh. 4 - Lorenz Depo: 56:9-57:5)

The objective use of the property is the appropriate standard when determining whether

an area is a public forum:

> "The City asserts that as the 2012 Agreement grants BTLI exclusive use of the Park for this year's BTL event, the Park has been transformed to private property. The law is clear, however, that the City cannot change a traditional public forum by its own ipse dixit. See *United States Postal Serv. v. Council of Greenberg Civic Ass'n*, 453 U.S. 114,133 (1981) ("Congress, no more than a suburban township, may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums ..."). Instead, the Court must look to the objective use and purpose of the forum to determine the nature of such forum. For example, in *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 452 (6th Cir.2004), the court found that a private sidewalk encircling a sports complex was a traditional public forum as the sidewalk blended into the urban grid—it bordered the road and looked just like a public sidewalk—and because the sidewalk was a public thoroughfare. See also *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 494–95 (7th Cir.2000) (finding that private land that was once part of City land, and that continued to be used as a public park, is considered a public forum). *Jankowski v. City of Duluth*, No. CIV. 11 3392 MJD/LIB, 2012 WL 6044414, at *3 (D. Minn. Dec. 5, 2012).

In this case the Defendant did not establish its exterior use policy until after the Plaintiff was

initially arrested for trespassing:

> Q. Was it [The SMG exterior use policy] adopted after Larry Ball was first escorted from the premises for basically preaching Christianity there?
> A. It was memorialized at that time. As we were managers at – as I was a manager at Pershing Center before, we had a similar policy that we worked with for the area in front of Pershing.
> 
>      And as we carried – as we went forth and began to set up business at Pinnacle Bank Arena, it wasn't memorialized immediately, but the document will show that it was put in place and put on the Web site after Mr. Ball was first approached at the – into the plaza area.
> 
> Q. And how long after Mr. Ball was first approached and escorted from the

premises was it adopted?
A. I don't know exactly. I would have to look back at the documents. It was sometime after.

Q. Had other individuals been escorted from the premises for trying to exercise first amendment rights in that area, other than Mr. Ball?
A. No, none others that I have – that I remember.

Q. And when did you first become aware that Mr. Ball was preaching Christianity on – in the area that he was subsequently removed from?
A. When Mr. Ball – when we first approached him, he certainly would hand us his pamphlet, and it was clear what he was working with was a Christian message in his pamphlet.
(Def. Exh. 4 - Lorenz Depo: 8:8-9:12)

Because the government lacks the power (through the mechanism employed here) to transfer a traditional public forum into a non-public forum, the question of the initial status of the plaza (sidewalks) surrounding the arena is crucially important. If SMG's exterior use policy was not memorialized at the time of the Plaintiff's initial arrest, then the question of whether the plaza and other exterior areas are or were public forums rises or falls based on the validity of SMG's unwritten exterior use policy.

The Pinnacle Bank Arena/SMG Exterior Access and Use Policy (Def. Exh A. of Exh. 3 - Aff. of Lorenz) states that the effective date of the policy was October 14, 2014. Before that date, including the time of the Plaintiff's initial arrest for trespassing in March of 2014(Def. Exh. 5 - Ball Depo: 15:14-24), the Defendant claims that SMG had in place an unwritten exterior use policy. (Def. Exh. 4 - Lorenz Depo: 8:8-9:12). According to the Defendant "The historical roots of the policy was the policy SMG had employed when operating the Pershing Center.". (Defendant's Brief pg. 21). SMG's unwritten exterior use policy clearly violates due process because it is vague and does not place arena patrons on notice regarding which conduct is and is

not prohibited:

> though we have concluded the district court did not abuse its discretion in determining Powell will likely not succeed in proving a violation of his First Amendment rights, the allegation that these rules violate Powell's due process rights still implicates speech that both parties agree is protected. "A law's failure to provide fair notice of what constitutes a violation is a special concern where laws 'abut[ ] upon sensitive areas of basic First Amendment freedoms' because it 'inhibit[s] the exercise' of freedom of expression and 'inevitably lead[s] citizens to steer far wider of the unlawful zone ... than if the boundaries of the forbidden area were clearly marked.' " *Stahl*, 687 F.3d at 1041 (alterations in original) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The fair can prohibit impediments to the flow of people into, out of, and within the fairgrounds, but it must do so "with reasonable specificity toward the conduct to be prohibited." *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); see also *Stahl*, 687 F.3d at 1041 ("So long as the ordinance is clear and provides fair notice as to what conduct is deemed likely to cause a traffic problem, these regulations do not offend due process."); *FAIR*, 111 F.3d at 1415 (noting an unwritten rule or policy is not automatically vague, but should be "made explicit by well-established practice," because "[t]o survive a vagueness challenge, a [rule] must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply" it (first alteration in original) (internal quotation marks omitted)). Accordingly, we remand this case to the district court for consideration of whether Powell is entitled to preliminary injunctive relief based on his due process claim. *Powell v. Noble*, 798 F.3d 690, 703 04 (8th Cir. 2015).

There can be no doubt that this unwritten policy did not give the Plaintiff "a reasonable opportunity to know what is prohibited" *Id*. The unwritten policy was not "made explicit by well-established practice" *Id*. because the Plaintiff is the only person who has been escorted from the premises for violating the unwritten policy. (Def. Exh. 4 - Lorenz Depo: 9:1-5)

At the time of Mr. Ball's initial arrest, the unwritten policy was the only policy in place restricting a member of the public's ability to speak in the plaza and exterior walkway areas surrounding the arena. The fact that the unwritten policy was enforced arbitrarily, and that Mr. Ball was the only person ever ejected from the property or arrested under the policy, suggests that

the policy violates due process both because it was not explicit and because it was targeted at Mr. Ball because of the content of his message. The unwritten policy is and was a clear violation of the Constitution and therefore there were no valid restrictions regarding the Arena's exterior areas. The failure of the City of Lincoln and SMG to enact a written exterior use policy prior to opening those areas to the public means that the sidewalks and plaza surrounding the arena are public forums. The function and design of the exterior areas of the arena clearly indicate that the walkways and plaza are blended into the urban grid and were designed as a public thoroughfare. In *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 452 (6th Cir. 2004). the 6th Circuit ruled that an arena's external areas were traditional public forums because they were integrated into the grid and were opened for pedestrian passage even though a public sidewalk ran parallel to the Gateway Sidewalk at issue in that case. The fact that the Gateway Sidewalk was separated visually from the surrounding public sidewalk by planters and other similar markers did not alter the functional analysis of the court which focused on the integration of the exterior areas into the city grid. *Id.* In this case the Arena's external areas were integrated into the city grid and were opened to pedestrians before any written exterior use policy was established, therefore those areas were established as traditional public forums. Since those areas were established as traditional public forums at the time they were opened to the public, SMG may not now change the character of those areas by reference to a newly enacted exterior use policy. See *United States v. Grace*, 461 U.S. 171, 180, 103 S. Ct. 1702, 1708, 75 L. Ed. 2d 736 (1983). (finding that the government may not transform the character of property which is a designated public forum by changing the statutory definition of that property)

**B.      The Plaza area is a Traditional Public Forum**

The design and function of the Plaza area clearly indicates that it was intentionally blended into the urban grid. Members of the public are allowed to speak and/or congregate around the sign.

> Q. So it's (the plaza area near the sign) a regular area used by the public for purposes other than entrance into the Pinnacle Arena?
> A. It can be. ... (Def. Exh. 4 - Lorenz Depo: 55:17-20)
>
> Q. And if somebody, for whatever reason, during entrance or exit from a concert that was up towards the Saltdogs came down that ramp and went over to look at where he could go for direction, would he be in violation of SMG's policy?
> A. As long as they weren't doing any of the activities that are in our policy, they would not be in violation of that area.
>
> Q. Okay. So it's – their right to be there is clear? It's – what your controlling is they don't have the right to speak out about their cause, whether it's religion or something else? That violates the policy, not their presence, but the speaking out about their cause?
> A. The activities that we cover would be, you know, selling material, selling T-shirts that weren't authorized, you know, within – as part of the production, food, those types of things.
> And so there's multiple activities, and the policy was not directed and had no bearing on whether he was handing out religious material or not. (Def. Exh. 4 - Lorenz Depo: 56:9-57:5)

This, combined with its continued use as a public thoroughfare, indicates that the Plaza is a public forum:

> The Gateway Sidewalk encircles the Complex, and looks and feels like a typical public sidewalk. Because the Supreme Court has explained that from "[t]ime out of mind public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum," Frisby v. Schultz, 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), UCC argues that the Gateway Sidewalk is a traditional public forum, a place in which the "right to limit protected expressive activity is sharply circumscribed." Chabad of S. Ohio v. City of Cincinnati, 363 F.3d 427, 434 (6th Cir.2004) (internal quotations omitted).
>
> There are two key reasons why UCC is correct. First, the Gateway Sidewalk blends into the urban grid, borders the road, and looks just like any public

14

sidewalk. Indeed, a public sidewalk—which runs parallel to the Gateway Sidewalk—circumscribes the Complex and borders the municipal streets. Further, the public and Gateway sidewalks are made of the same materials and share the same design. In United States v. Grace, 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Supreme Court held that a sidewalk bordering the Supreme Court constituted a public forum because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." See also Venetian Casino Resort v. Local Joint Executive Bd. of Las Vegas, 257 F.3d 937, 947 (9th Cir.2001) (applying First Amendment to privately owned sidewalk that "is connected to and virtually indistinguishable from the public sidewalks to its north and south"); Henderson v. Lujan, 964 F.2d 1179, 1182 (D.C.Cir.1992) ("The two sidewalks here appear to be classic instances. They are physically indistinguishable from ordinary sidewalks used for the full gamut of urban walking."). Moreover, although in some areas the Gateway Sidewalk's border is roughly delineated by fifteen-foot-long planter boxes containing trees, this fact does not alter our conclusion. As the district court rationally determined, the average observer would be unfamiliar with the geographic significance of this sporadic vegetation.

Second, like its publicly owned counterparts, the Gateway Sidewalk also is a public thoroughfare. By design, the Gateway Sidewalk contributes to the City's downtown transportation grid and is open to the public for general pedestrian passage. Indeed, rather than leading to the rest of the Complex, the Gateway Sidewalk encircles it as a through route. Although Gateway contends that the majority of the Gateway Sidewalk's pedestrians are traveling to and from Indians and Cavaliers games, "[t]he mere fact that a sidewalk abuts property dedicated to purposes other than free speech is not enough to strip it of public forum status." Henderson, 964 F.2d at 1182.

*United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 452 (6th Cir. 2004).

The gateway sidewalk in *Gateway Econ. Dev. Corp. of Greater Cleveland* for part of its length runs parallel to E 9th St. and includes a plaza area very similar to the one at issue in this case on the corner of Eagle Ave. And E 9th St. These exterior walkways were held to be public forums because they were open to the public at all times and were integrated into the city grid. The "Commons" area at issue in *Gateway Econ. Dev. Corp. of Greater Cleveland* was held not to be a public forum because access to the commons area was restricted and non-ticketholders were

not generally allowed "to access the Commons during gametime" *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 453 (6th Cir. 2004). The plaza area at issue in this case is essentially identical to the Gateway Sidewalk and is vastly different than the Commons area at issue in *Gateway Econ. Dev. Corp. of Greater Cleveland*. The plaza area in this case, especially the area near the sign with the map on it at the foot of the pedestrian bridge, the very place where Mr. Ball was arrested and ticketed, is a necessary component of the City of Lincoln's transportation grid. Pedestrians regularly cross over the Pedestrian bridge which connects to Arena parking which is held open to the public. (Def. Exh. 4 - Lorenz Depo: 12-20) SMG does not restrict speech on the Pedestrian Bridge. (Def. Exh. 4 - Lorenz Depo: 19:1-9). The pedestrian bridge at issue in this case serves a critical function within the Lincoln downtown transportation grid; the bridge is designed and intended to convey pedestrians from the parking lot on the north side of the train tracks to the Haymarket and the arena. (Plf. Exh. 1 - Cary Depo: 26:2-17) Members of the public who exit the bridge must walk within a few feet of the sign near which the Plaintiff was arrested. Because the Bridge is critical to the network of public sidewalks and the plaza area is at the foot of the bridge and must be passed through to access the Haymarket, the plaza is integrated into the grid of Downtown Lincoln. This situation is similar to that in *Lewis v. Colorado Rockies Baseball Club, Ltd.* where the external areas of that arena were "specifically designed to be integrated into downtown Denver's street grid. As such, the sidewalks are not used solely for ingress and egress to the stadium but connect with, and essentially function in the same manner as, the municipal sidewalks throughout the downtown area." *Lewis v. Colorado Rockies Baseball Club, Ltd.*, 941 P.2d 266, 274 (Colo. 1997). The court in *Lewis* "concluded that all three of the disputed areas are public forum

property under federal constitutional analysis". Lewis v. Colorado Rockies Baseball Club, Ltd., 941 P.2d 266, 275 (Colo. 1997).

## II.

**STRICT SCRUTINY IS THE APPROPRIATE STANDARD AND THE ARENA'S EXTERIOR USE POLICY CANNOT SURVIVE STRICT SCRUTINY.**

**A.**     **The exterior use policy is unconstitutional on its face because it restricts expression in areas which are clearly public forums and is overbroad.**

As argued above, the sidewalks and plaza areas surrounding the arena are public forums. Where sidewalks are integrated into the grid and are open to the public then they are generally held to be public forums:

> Whether a given sidewalk is considered a public forum, of course, hinges on a case-by-case inquiry in which no single factor is dispositive. The Gateway Sidewalk differs from those sidewalks that have not been held to be public fora because it is fully integrated into the downtown and indistinguishable from its adjoining publicly owned sidewalk both physically and in its intended use. *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 453 (6th Cir. 2004).

In this case, the Exterior Use Policy is unconstitutional because it is overbroad.

> In the First Amendment context, however, this Court recognizes "a second type of facial challenge," whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449, n. 6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (internal quotation marks omitted). *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010).

Because many of the exterior areas of the arena which are covered by the policy are not well marked and also because it is unclear exactly which sorts of conduct are prohibited:

"Q. Well, wait a minute.

Could he just stand there and preach if he didn't hand out pamphlets?

A. I don't know the answer to that." (Def. Exh. 4 - Lorenz Depo: 57:6-9)

Because of this uncertainty, the exterior use policy will have a chilling effect on protected speech

in and around the arena's exterior areas.

> Unlike vagueness, "[t]he First Amendment doctrine of overbreadth is an
> exception to [the] normal rule regarding the standards for facial challenges."
> Virginia v. Hicks, 539 U.S. 113, 118, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003).
> "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the
> exercise of First Amendment rights if the impermissible applications of the law
> are substantial when 'judged in relation to the statute's plainly legitimate sweep.' "
> Morales, 527 U.S. at 52, 119 S.Ct. 1849 (quoting Broadrick, 413 U.S. at 615, 93
> S.Ct. 2908); see Turchick v. United States, 561 F.2d 719, 721 (8th Cir.1977)
> ("The aim of facial overbreadth analysis is to eliminate the deterrent or 'chilling'
> effect an overbroad law may have on those contemplating conduct protected by
> the First Amendment." (footnote omitted)). The facial overbreadth doctrine is
> restricted in its application, however, and is "not recognized ... outside the limited
> context of the First Amendment." United States v. Salerno, 481 U.S. 739, 745,
> 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Schall v. Martin, 467 U.S. 253, 268 n. 18,
> 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ("[O]utside the limited First Amendment
> context, a criminal statute may not be attacked as overbroad."). *Musser v. Mapes*,
> 718 F.3d 996, 1001 (8th Cir. 2013).

The chilling effect which will result from this policy will impact speech which the Defendant

claims is authorized under the policy. The policy does not clearly disallow or allow preaching,

(as admitted by SMG officials above) photography, or speaking with members of the crowd.

Does SMG consider preaching to be prohibited "charitable solicitations"? Is asking members of

the public about their opinion on an upcoming election a "media interview"? Is videotaping or

taking pictures of the crowd a prohibited "Media Usage"? These are only some of the questions

that members of the public will be left to guess at when they want to speak near the Arena. The

SMG exterior use policy is overbroad both because it reaches clearly protected activities within

the arena's public external areas, but also because it will have a chilling effect near those areas

where the public is uncertain as to the dividing line.

**B.    The exterior use policy should face strict scrutiny because it was enacted to persecute the Plaintiff and his message**.

SMG's exterior use policy is unconstitutional as applied to the Plaintiff because it was enacted to target him and his message and also because it has been enforced in a content-based fashion. The supreme court has stated that an otherwise content-neutral regulation of speech can become content based if it is applied in a discriminatory fashion: "Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325, 122 S. Ct. 775, 781, 151 L. Ed. 2d 783 (2002). The record in this case raises the question of whether SMG's policy has been enacted and enforced in a content-discriminatory manner.

> Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy. *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011).

At minimum, the facts in the record allow the inference that the Plaintiff was the target of the exterior use policy and that the policy has been enforced against him as a result of his religious message.  The exterior use policy was only enacted after the Plaintiff was initially arrested for trespassing under the original "unwritten policy". Tom Lorenz, the man chiefly responsible for SMG's exterior use policy, was aware of the Plaintiff and his religious message prior to enactment of the policy. Additionally, no other individual has been escorted from the

premises as a result of the policy:

> Q. Was it [The SMG exterior use policy] adopted after Larry Ball was first escorted from the premises for basically preaching Christianity there?
> A. It was memorialized at that time. As we were managers at – as I was a manager at Pershing Center before, we had a similar policy that we worked with for the area in front of Pershing.
> And as we carried – as we went forth and began to set up business at Pinnacle Bank Arena, it wasn't memorialized immediately, but the document will show that it was put in place and put on the Web site after Mr. Ball was first approached at the – into the plaza area.

> Q. And how long after Mr. Ball was first approached and escorted from the premises was it adopted?
> A. I don't know exactly. I would have to look back at the documents. It was sometime after.

> Q. Had other individuals been escorted from the premises for trying to exercise first amendment rights in that area, orther than Mr. Ball?
> A. No, none others that I have – that I remember.

> Q. And when did you first become aware that Mr. Ball was preaching Christianity on – in the area that he was subsequently removed from?
> A. When Mr. Ball – when we first approached him, he certainly would hand us his pamphlet, and it was clear what he was working with was a Christian message in his pamphlet. (Def. Exh. 4 - Lorenz Depo: 8:8-9:12)

Mr. Lorenz has permitted political messages, T-shirts, and other merchandise to be distributed in the plaza area, despite the fact that this distribution is more likely to create the crowd control problems which the policy was supposedly enacted to prevent.

> Q. Okay. Now, does SGM ever allow anyone to set up, let's say, T-shirt sales in the are in which Mr. Ball was excluded from?
> A. Yes.

> Q. So has SMG ever allowed anyone to set up tables with political messages?
> A. No.

> Q. I'm thinking, oh, Neil Young?
> A. Neil had a series of tents, and he had some things that were politically important to him as part of their production and part of their setup.

Q. Okay. Just – we'll work the question. Did Neil Young and did SMG permit Neil Young to have political messages in the area it excludes Mr. Ball from?
A. Yes

Q. All right. And those – let me ask you this: A T-shirt stand, is that likely to hold a bigger crowd than some old guy handing out Jesus pamphlets?
A. Is it likely to hold a larger crowd? It potentially could, depending on how well T-shirt sales are going.

(Def. Exh. 4 - Lorenz Depo: 24:2-24)

Perhaps most troubling, Mr. Lorenz acknowledges that the exterior use policy allows individuals to congregate in the plaza area where Mr. Ball was arrested to view the sign or to talk about matters unrelated to any Arena event, but claims not to know whether Mr. Ball would be permitted preach in the plaza under the policy:

Q. Well, wait a minute.
    Could he just stand there and preach if he didn't hand out pamphlets?
A. I don't know the answer to that. (Def. Exh. 4 - Lorenz Depo: 57:6-9)

The Plaintiff contends that his speech has been targeted by SMG because of the content of his message. He is the only person who has been targeted under the policy and it is clear from Tom Lorenz's deposition that he was at minimum aware of the Plaintiff's message when he enacted the written exterior use policy. This case must proceed to trial where a jury can determine whether the policy was enacted in an effort to target the Plaintiff and his message and whether the policy has been enforced against the Plaintiff on the basis of the content of his message.

C.    **The exterior use policy is unconstitutionally vague and provides SMG officials too much discretion**

In addition to the over-breadth and chilling effect issues mentioned above, the exterior use policy is also impermissibly vague and provides SMG officials with essentially unlimited discretion to permit favored messages and prohibit disfavored ones. A regulation which allows

for arbitrary application is not consistent with a valid time, place, or manner regulation:

> "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.' " Forsyth, 505 U.S. at 130, 112 S.Ct. at 2401 (quoting Heffron, 452 U.S. at 649, 101 S.Ct. at 2565). The lack of objective criteria in the governmental exemption "readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure, [and] results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." Thornhill, 310 U.S. at 97–98, 60 S.Ct. at 742. Because under the Festivals Ordinance there are fewer obstacles to the expression of speech that the city endorses, the governmental exemption allows the city to remove onerous burdens from organizations that the city chooses to endorse. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1279 (11th Cir. 2006).

The exterior use policy also provides insufficient guidance to individuals who want to express themselves near the Arena. As expressed above, (II. A) it is unclear what types of expressive conduct are prohibited and also which areas are impacted.

Q. Well, wait a minute.
  Could he just stand there and preach if he didn't hand out pamphlets?
A. I don't know the answer to that. (Def. Exh. 4 - Lorenz Depo: 57:6-9)

The public has not been given fair notice as to which acts are prohibited by the policy:

> The appellant contends that the subsection violates the right of free speech and press because it is vague and indefinite. It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment. Stromberg v. People of State of California, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484; Herndon v. Lowry, 301 U.S. 242, 258, 57 S.Ct. 732, 739, 81 L.Ed. 1066. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment violates an accused's rights under procedural due process and freedom of speech or press. *Winters v. New York*, 333 U.S. 507, 509 10, 68 S. Ct. 665, 667, 92 L. Ed. 840 (1948).

The exterior use policy allows SMG officials essentially unlimited discretion, discretion which they can use to punish speakers who they disagree with. The vague wording of the exterior use policy, as well as the confusing perimeter of the area covered, will create a chilling effect on speakers who might otherwise speak out near the Arena.

**D.     The exterior use policy fails strict scrutiny**

The proper standard for analyzing the constitutionality of SMG's exterior use policy is Strict Scrutiny because the policy is overbroad, vague, provides SMG officials with too much discretion, and because it was enacted and has been enforced specifically as a response to the content of the Plaintiff's speech. Strict Scrutiny requires that the measures which restrict speech must be narrowly tailored and also requires that the government have a compelling state interest:

> The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., Amdt. 1. Under that Clause, a government, including a municipal government vested with state authority, "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. R.A.V. v. St. Paul, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 115, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015).

In this case, even assuming that SMG has a compelling state interest in crowd control or ensuring access to the external areas for tenants (the justifications stated in the Exterior Use Policy), the Exterior Use Policy is not narrowly tailored.

> Assuming that the Town has a compelling interest in preserving its aesthetic appeal and traffic safety, the Code's distinctions are highly underinclusive. The Town cannot claim that placing strict limits on temporary directional signs is

necessary to beautify the Town when other types of signs create the same
problem. See Discovery Network, supra, at 425, 113 S.Ct. 1505. Nor has it shown
that temporary directional signs pose a greater threat to public safety than
ideological or political signs. Pp. 2231 – 2232. *Reed v. Town of Gilbert, Ariz.*, 135
S. Ct. 2218, 2223, 192 L. Ed. 2d 236 (2015)**.**

Mr. Lorenz admitted in his deposition that activities which are permitted under the policy could

pose a greater threat to crowd control than the Plaintiff's activities did.

> Q. Okay. Now, does SGM ever allow anyone to set up, let's say, T-shirt sales in
> the are in which Mr. Ball was excluded from?
> A. Yes.
>
> Q. So has SMG ever allowed anyone to set up tables with political messages?
> A. No.
>
> Q. I'm thinking, oh, Neil Young?
> A. Neil had a series of tents, and he had some things that were politically
> important to him as part of their production and part of their setup.
>
> Q. Okay. Just – we'll work the question. Did Neil Young and did SMG permit
> Neil Young to have political messages in the area it excludes Mr. Ball from?
> A. Yes
>
> Q. All right. And those – let me ask you this: A T-shirt stand, is that likely to hold
> a bigger crowd than some old guy handing out Jesus pamphlets?
> A. Is it likely to hold a larger crowd? It potentially could, depending on how well
> T-shirt sales are going. (Def. Exh. 4 - Lorenz Depo: 24:2-24)

To the extent that the exterior use policy is justified by crowd control concerns, it is hopelessly

under inclusive. However it is also important to note that plaintiff never actually interfered with

crowd control or caused any crowd control problems:

> Q. How about the second time?
> A. In 2015?
>
> Q. Yes.
> A. Yes
>
> Q. Where was he standing?

> A. Standing outside of this set of doors (indicating), aproximately, probably, 15 to 20 feet outside of the doorway in the – what would be the middle of the plaza.
>      And that was where I first contacted him.
> He stayed there. And that's where the Lincoln Police Department contacted him and began their discussion with him.
>
> Q. What event was going on that day?
> A. I believe it was one of – either boy's or girl's state basketball.
>
> Q. All right. Had a crowd gathered around him? Was he surrounded by eager listeners?
> A. He was not surrounded by a crowd, no.
>
> Q. Okay. Was he causing anyone not to be able to get in or out of the door?
> A. No, he wasn't.
>
> Q. Okay. So in that situation, at that time, he wasn't causing any kind of crowd management problems?
> A. Correct. (Def. Exh. 4 - Lorenz Depo: 53:9-54:18)

The Defendant has failed to offer any evidence tending to show that the Plaintiff interfered in any way with the use of the plaza area by Arena tenants or created any crowd control problems.

Therefore, under strict scrutiny, the Exterior Use Policy is unconstitutional.


## III.

## THE EXTERIOR USE POLICY ALSO FAILS INTERMEDIATE SCRUTINY.

If the court finds that the exterior use policy is content neutral despite the arguments above, then the proper standard is intermediate scrutiny. SMG's exterior use policy fails the tailoring prong of Intermediate Scrutiny and also does not provide adequate alternative channels of communication.

> Content neutral regulations of the time, place, or manner of speech in a public forum are permissible under the First Amendment if "they are narrowly tailored to serve a significant governmental interest and ... they leave open ample alternative

channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quotation omitted) *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, Mo.*, 775 F.3d 969, 974 (8th Cir. 2014).

In this case SMG's exterior use policy burdens all leafleting and many other types of expressive activities in the Arena's external areas. The policy does not apply only to speech which actually harms or impacts arena tenants' use of the arena or speech which creates crowd control concerns. The Exterior use policy essentially bans huge categories of expression without regard to whether the speech actually impacts the significant governmental interest at issue. Additionally the Arena has not demonstrated that expressive activities have harmed or are likely to harm either crowd control or tenants' use of the arena.

> To be narrowly tailored, a regulation must not " 'burden substantially more speech than is necessary to further the government's legitimate interests.' " McCullen v. Coakley, —— U.S. ——, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014), quoting Ward, 491 U.S. at 799, 109 S.Ct. 2746. The city was therefore required to make a "threshold showing that the factual situation demonstrate[d] a real need for [it] to act to protect its interest." Assoc. of Comm. Orgs. for Reform Now v. St. Louis Cnty., 930 F.2d 591, 595 (8th Cir.1991). *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, Mo.*, 775 F.3d 969, 975 (8th Cir. 2014).

SMG and the City of Lincoln have not presented any facts which demonstrate that an exterior use policy is necessary to protect the interest of their tenants or to control crowds in the plaza area. Nor have they offered any studies or evidence of the fact that the exterior use policy currently in place is narrowly tailored to the interests at issue. There is no way for Mr. Ball to simultaneously reach Arena patrons crossing the plaza and individuals exiting the pedestrian bridge other than by standing in the plaza area near the sign. The exterior use policy clearly burdens substantially more speech then necessary and does not allow alternative means for the Plaintiff to reach the

same audience, therefore it fails intermediate scrutiny.

## **CONCLUSION**

The right of citizens to speak freely in Lincoln's public spaces is in jeopardy. As the above arguments show, SMG and Lincoln have allowed to stand a policy which severely curtails the ability of the public to speak near the Arena. The defendants have not made the factual showings necessary to uphold the Exterior Use Policy. Additionally the policy grants SMG employees essentially unlimited discretion to target any message that they wish to prohibit. At the very least, issues of material fact remain unresolved in this case. If SMG employees exercised their authority under the Exterior Use Policy against the Plaintiff because of his message, a conclusion strongly suggested by the record as it stands now, then the policy must be struck down and the Plaintiff's rights vindicated. Additional material facts include the extent to which SMG and/or Lincoln studied the impact of their policy on speech and whether the policy is sufficiently narrow to avoid an unnecessary burden on speech. The remaining issues of material fact show that the City of Lincoln's motion for summary judgment must be denied.

LARRY BALL, PLAINTIFF

BY:    s/Thomas M. White
        Thomas M. White, #17452
        Amy S. Jorgensen, #23215
        Benjamin White, (Senior Certified)
        WHITE & JORGENSEN
        209 South 19th Street, Suite 310
        Omaha, Nebraska  68102
        (402) 346-5700

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

  I hereby certify that on May 4, 2016,  I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of such filing to Jocelyn W. Golden, Assistant City Attorney, 555 S. 10th Street, Suite 300, Lincoln, NE  68508 and Brian Nolan, Nolan Olson & Stryker, PC LLO, Two Old Mill #240, 10855 W. Dodge Rd., Omaha, NE 68154.

        s/Thomas M. White