# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LARRY BALL,<br><br>     **Plaintiff,**<br><br>  vs.<br><br>CITY OF LINCOLN, NEBRASKA,<br>and SMG, a Pennsylvania General<br>Partnership;<br><br>     **Defendants.** | 8:15CV95<br><br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 55), filed by Defendant City of Lincoln (the "City"); the Motion for Partial Summary Judgment (Filing No. 57), filed by Defendant SMG; and the Motion for Leave to File Rebuttal to Defendants' Supplemental Index of Evidence (Filing No. 69), filed by Plaintiff Larry Ball ("Ball"). For the reasons set forth below, the Motions for Summary Judgment will be granted and the Motion for Leave will be denied as moot.[1]

## BACKGROUND

The following facts are those stated in the Parties' briefs, supported by pinpoint citations to evidence in the record, according to NECivR 56.1[2] and Federal Rule of Civil Procedure 56.

---

[1] The Court did not consider materials submitted in the Defendants' Supplemental Index of Evidence (Filing No. 66).

[2] *See* NECivR 56.1(b)(1) (effective December 1, 2015):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party

Ball is a resident and citizen of the City of Lincoln, Lancaster County, Nebraska. The City is a political subdivision and city of the State of Nebraska that owns the Pinnacle Bank Arena (the "Arena") and associated improvements and facilities for the benefit of the citizens of the City. SMG is a Pennsylvania general partnership that serves as the management company of the Arena and attendant facilities on behalf of City.

Beginning in 2010, the City and the University of Nebraska (the "University"), through the creation of the West Haymarket Joint Public Agency ("JPA"), began the redevelopment of the West Haymarket in the City, which included construction of the Arena; several parking garages to the west and south of the Arena; a festival space/surface parking lot to the north of the Arena; a pedestrian overpass or bridge accessing the festival space from the Arena; and new roads, streets, and sidewalks accessing all these facilities. The pedestrian bridge also serves to connect the downtown sidewalk system to the nearby baseball/softball stadium complex as well as the City's trail system. (Filing No. 56-5, Ball Depo: 104:18-107:4.[3]) The Arena was to be used in part as the home court for games for the University's men's and women's basketball teams, and was built to replace the City's aging Pershing Center that was operated by SMG for more than a decade, until that Center's closing in 2014.

Before the new roads, streets, and sidewalks were constructed adjacent to the Arena, the area was dominated by railroad tracks. Those were moved west to

relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

[3] Unless otherwise indicated, pinpoint citation to deposition page numbers refer to the page of the deposition transcript and not the ECF page number.

accommodate the Arena and attendant facilities. The City managed construction and development of the Arena and attendant facilities, roads, streets, and sidewalks pursuant to a Facilities Agreement with the JPA.

The City entered into a Management Agreement with SMG for management of the Arena on June 7, 2012, granting SMG the "exclusive right to manage, market, promote and operate the Facilities." (Filing No. 1-6 at ECF 12.)

In October 2014, SMG adopted the written Pinnacle Bank Arena/SMG Exterior Access and Use Policy (the "Policy"), complete with accompanying diagrams. The Policy was consistent with an unwritten policy followed by SMG since the Arena opened. The Policy was posted on the Arena's website, and copies were made available to the public. The Policy designated certain exterior areas as "nonpublic forum areas" (the "Policy Zone") reserved for the use of tenants and the artists or productions they authorized. The Policy Zone included an exterior plaza located at the southeast corner of the Arena property near the southeast entrances of the Arena. (the "Plaza Area") (*See* Filing No. 1-7). The Defendants assert that the Plaza Area delineated in the Policy can be identified using landmarks and physical characteristics such as cement planters, metal stanchions or bollards, and distinctly colored concrete. (*See* Filing No. 13-2, at ECF 4-15; Filing No. 56-4, Depo. Lorenz, 21:3-22:11.) A diagram of the Policy Zone, including the Plaza Area appears below as Figure 1:



*Figure 1: Policy Zone perimeter around Arena property (Policy, Filing No. 1-7 at ECF 2.) The Plaza Area appears at the southeast corner of the Policy Zone.*

One of the stated purposes of the Policy is to protect the Plaza Area in front of main doors for use by tenants and the artists or productions they authorize, because the Plaza Area is considered a space included in the tenants' lease of the facility. (Filing No. 56-3 at ECF 2, Aff. Lorenz, ¶ 7.) Another stated purpose of the Policy is to ensure safety and crowd management of the Plaza Area. (Filing No. 56-3 at ECF 2-3, Aff. Lorenz, ¶ 9, Filing No. 56-4, Depo. Lorenz, 22:8-13.) Defendants assert that the Plaza Area outside the Arena entrances is used by patrons to enter and exit the Arena before

and after performances and sporting events, and crowds of 12,000 to 15,000 may attend single events. The Plaza Area sometimes is used for security screening as well. (*Id.*) The Policy also provides for public areas outside the Policy Zone. (Filing No. 56-3 at ECF 3, Aff. Lorenz, ¶ 10; Filing No. 56-4, Depo. Lorenz, 35:23-36:2.)

Ball has handed out leaflets in proximity to the Arena on at least four occasions. On March 15, 2014, he distributed religious tracts to people attending the boys' state high school basketball tournament outside the Arena. The areas where he stood included the area immediately outside the doors of the Arena. He was approached several times by SMG staff who asked him to move outside the Plaza Area to the public sidewalk. Ball told SMG staff and/or Lincoln police officers he would leave, but would come back to continue leafleting. Ball returned later that afternoon and began leafleting in the Plaza Area north of the bollards. The Lincoln Police Department was called by SMG staff when Ball refused to move. Lincoln police officers approached Ball and asked him to move to the sidewalk outside the Plaza Area. Ball refused to move, asserting that he had a right to distribute pamphlets in the Plaza Area. He was then arrested and ticketed for trespassing and refusing to comply with the officers' directives. The charges against Ball were dismissed by the City Attorney's Office in May of 2014.

Nearly one year later, on March 5, 2015, Ball returned to the Arena and handed pamphlets to people attending the girls' state high school basketball tournament. He was aware of the written Policy and had read it. He stood in the Plaza Area north of the bollards, approximately 25 feet from an Arena door. The Lincoln Police Department ticketed Ball for trespassing, but did not arrest him. He returned on March 7, 2015; engaged in the same conduct; and was ticketed again but not arrested.

During the second weekend of March 2015, Ball distributed leaflets outside the Arena during the boys' state basketball tournament. He stayed on the sidewalk outside the Plaza Area and was not ticketed or disturbed.

On July 23, 2015, Ball was found guilty of trespassing for the citations issued on both March 5, 2015, and March 7, 2015, and fined $50.00 for each citation.

The Lincoln Police Department has not cited any other individuals for trespassing or other criminal violations in connection with the Arena's Policy.

Ball filed this action on March 12, 2015, seeking permanent injunctive relief and monetary damages for alleged violations of his First Amendment rights. (Filing No. 1). Contemporaneous with his Complaint, he filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Filing No. 2.) On April 15, 2015, the Court denied Ball's Motion for Preliminary Injunction, concluding, in part, that Ball was unlikely to prove that the Plaza Area was a public forum. (Filing No. 24.)

## STANDARD OF REVIEW

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S. Ct. 513 (2011)). In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five*

*Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Id.* at 325.  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.* (quoting Fed. R. Civ. P. 56(c)).

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial."  *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial."  *Briscoe,* 690 F.3d at 1011 (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042).  "[T]he mere existence of some alleged factual dispute between the parties" will not defeat an otherwise properly supported motion for summary judgment.  *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine

dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (internal quotation marks omitted) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## DISCUSSION

Ball argues that the Policy, and Defendants' enforcement of the Policy, violate his First Amendment rights. The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. However, the Supreme Court has stated that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 799–800 (1985). "The Supreme Court has 'adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013) *cert. denied,* 134 S. Ct. 824 (2013) (quoting *Cornelius,* 473 U.S. at 800). "The extent to which the Government can control access depends on the nature of the relevant forum." *United States v. Kokinda*, 497 U.S. 720, 726 (1990) (quoting *Cornelius,* 473 U.S. at 800). The Court first must determine whether the Plaza Area is a traditional public forum, to

determine the level of scrutiny to apply when evaluating the Policy. Then the Court must determine whether the Policy is a reasonable restriction on speech.

## I.    Public Forum Analysis

In their Motions for Summary Judgment, the Defendants argue that the Policy is a reasonable restriction on speech because the Plaza Area is a nonpublic forum. Ball asserts that the Plaza Area is a public forum for First Amendment purposes. As noted in the Preliminary Injunction Order, the Supreme Court has identified three categories of forums in the free speech context: (1) the traditional public forum, (2) the designated public forum,[4] and (3) the nonpublic forum. *Perry Edu. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). Traditional public forums include "places which by long tradition or by government fiat have been devoted to assembly and debate" and in such forums "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* at 45. Traditional public forums are those that have "immemorially been held in trust for the use of public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions . . . ." *Id.* (internal marks omitted). The Supreme Court has recognized "streets, sidewalks, and parks" as traditional public forums. *U.S. v. Grace*, 461 U.S. 171, 177 (1983). "In these quintessential public forums, the government may not prohibit all communicative activity." *Perry*, 460 U.S. at 45. A content-neutral regulation

---

[4] A "designated public forum" is defined as "public property which the State has opened for use by the public as a place for expressive activity." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334 (8th Cir. 2011) (quoting *Perry*, 460 U.S. at 45). Ball does not argue or present evidence that the City has designated the Plaza Area as a public forum.

of speech in traditional public forums will only be upheld if it is narrowly tailored to serve a compelling government interest. *Perry*, 460 U.S. at 45; *Grace*, 461 U.S. at 177.

In contrast to public forums, on "[p]ublic property which is not by tradition or designation a forum for public communication," states may "preserve the property under its control for the use to which it is lawfully dedicated." *Perry*, 460 U.S. at 46 (internal marks and citation omitted). "Only if the public entity provides 'general access' does the public property become a designated public forum; if access is 'selective,' it is a nonpublic forum." *Victory*, 640 F.3d at 334 (quoting *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680 (1998)). A regulation of speech in nonpublic or limited forums will be upheld if it is reasonable "and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

At the preliminary injunction phase, the Court concluded that Ball was not likely to succeed on his claim that the Plaza Area was a traditional public forum. The parties now have had an opportunity to present their evidence and arguments, and the Court must assess whether the Plaza Area looks, acts, and functions like a public sidewalk, or whether it is a nonpublic forum, restricted to authorized uses. The Eighth Circuit has instructed that in determining whether a publicly owned property is a traditional public forum, courts must consider (1) whether the area manifests physical characteristics suggesting that it is "open for public passage," (2) "the traditional use of the property, the objective use and purposes of the space," and (3) "the government intent and policy with respect to the property." *Bowman v. White*, 444 F.3d 967, 977-78 (8th Cir. 2006). Having assessed these factors with the evidence before the Court, the Court concludes that the Plaza Area is not a traditional public forum.

### A.    Physical Characteristics of the Plaza Area

Ball argues that deposition testimony now establishes that the Plaza Area has the physical characteristics of a traditional sidewalk. Sidewalks are considered traditional public forums "generally without further inquiry." *U.S. v. Grace*, 461 U.S. 171, 179 (1983). The location and appearance of a walkway are key indicators in determining whether it is a sidewalk for purposes of the public forum analysis. *Id*. In *Grace*, the Supreme Court declared unconstitutional a broad restriction on speech on the public sidewalks surrounding the Supreme Court building. 461 U.S. at 175-81. In holding that the walkways surrounding its building were traditional public forums, the Supreme Court noted that "sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and we can discern no reason why they should be treated any differently." *Id*. The Court explained further that there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id*. at 180. Similarly, in *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland*, 383 F.3d 449, 451-53 (6th Cir. 2004), the Sixth Circuit held that a walkway surrounding a privately owned stadium and arena was a public forum because it blended into the urban grid, bordered the road, and looked like any public sidewalk, despite the presence of large planter boxes along the walkway.

Courts have recognized that plaza areas adjacent to public walkways are not necessarily blended into the urban grid such that the plazas are traditional public forums.  For example, in *Hodge v. Talkin*, 799 F.3d 1145, 1158 (D.C. Cir. 2015), *cert.*

*denied,* No. 15-863, 2016 WL 81163 (U.S. May 16, 2016), the D.C. Circuit held that the entrance plaza to the United States Supreme Court building was a nonpublic forum. In *Hodge*, the court specifically distinguished the Supreme Court's holding in *Grace*, reasoning that the Supreme Court "plaza's appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks and surrounding area." *Hodge*, 799 F.3d at 1158. The D.C. Circuit noted that the plaza was elevated from the sidewalk by a set of marble steps and a marble wall that defined the plaza's boundaries, and the plaza and steps contrasted sharply with the concrete sidewalk. *Id.* Thus, "whereas there was 'nothing to indicate to the public that [the] sidewalks are part of the Supreme Court grounds,' *Grace,* 461 U.S. at 183, there is everything to indicate to the public that the plaza is an integral part of those grounds." *Id.* at 1159.

Other courts have emphasized that physical characteristics, such as location, can set an area apart from sidewalks and other traditional public forums. For example, in *United States v. Kokinda*, 497 U.S. 720, 726 (1990), the Supreme Court examined whether a walkway leading from a dedicated parking lot to a post office was a traditional public forum. 497 U.S. at 723, 726. The Court reasoned that the walkway was constructed "solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office, not to facilitate the daily commerce and life of the neighborhood or city." *Id.* at 728. Moreover, the Court recognized that because the walkway led only from the dedicated parking lot to the post office, it was not a public thoroughfare that enjoyed traditional public forum protections. *Id.* at 727. Similarly, in *Friends of Animals, Inc. v. City of Bridgeport*, 833 F. Supp. 2d 205, 214 (D. Conn. 2011)

*aff'd sub nom. Zalaski v. City of Bridgeport Police Dep't*, 475 F. App'x 805 (2d Cir. 2012), the court held that a plaza directly in front of an arena was not a public forum because "it would be clear to pedestrians visiting the plaza that they have entered into property intended for use by patrons attending Arena performances." The court reasoned that the plaza was separated from public streets and sidewalks by landscaping, a grassy area, and a private driveway. *Id*.

Defendants concede that the markings of the boundary of the Plaza Area in this case—planter boxes, stanchions or bollards, and distinctly colored concrete—are not as dominant as the raised marble leading to the Supreme Court building. Further, the boundary elements identified by Defendants along the southern edge of the Plaza Area are less distinctive than the landscaping and grassy area that separated the plaza from the arena in *Friends of Animals, Inc. v. City of Bridgeport*. These features, on their own, may not permit an average observer to identify the boundaries of the Plaza Area. For example, as shown in Figure 2, the pedestrian overpass leading from parking lots north of the arena empties directly into the Plaza Area. (Policy, Filing No. 1-7 at ECF 4-5.) Access to the pedestrian bridge is not restricted, and SMG does not restrict speech on the bridge itself. (Filing No. 56-4, Lorenz Depo. 19:1-9.) There is evidence that pedestrians use the bridge to access the Haymarket District near the Arena from the parking lots north of the Arena. (See Filing No. 62-1, Cary Depo. 19:2-16.) As shown in Figure 2, the boundary line of the Policy Zone does not follow the precise boundary elements of the pedestrian bridge, nor does it precisely follow the distinctive concrete coloring which is carried outside the Plaza Area onto public sidewalks and into the street. Thus, the physical characteristics of the Plaza Area "'without more,' might make

[it a] traditional public for[um]." *Bowman*, 444 F.3d at 978 (quoting *Grace,* 461 U.S. at 177).

 

*Figure 2: Plaza area photographs (Policy, Filing No. 1-7 at ECF 4-5.) The blue arrow in the upper left hand corner shows the potential path of pedestrians exiting the bridge.*

In considering these characteristics, however, the Court must "[acknowledge] the presence of any special characteristics regarding the environment in which [the Plaza Area] exist[s,]" *Id.* at 975. The Plaza Area has several special characteristics that distinguish it from a sidewalk and it cannot be said that the Plaza Area seamlessly blends into the urban grid, borders the road, or looks like a public sidewalk. The boundary elements, combined with the size, shape, and general appearance of the Plaza Area serve to distinguish it from the adjacent public sidewalk to the south. The very presence of large public sidewalks bordering the Plaza Area signals that the Plaza Area is intended to serve a more limited function. *See Int'l Soc'y. For Krishna Consciousness v. Lee,* 505 U.S. 672, 680 (1991) ("[S]eparation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction."). The Court must weigh the Plaza Area's physical characteristics, together with its use and the government's intent for its use, to determine how this factor affects the forum analysis. *See Bowman*, 444 F.3d at 978

(stating that "the open nature of these spaces is merely a factor to consider in determining whether the government has opened its property" and courts must consider the other public forum factors, none of which is dispositive).

### B.    Use and Purposes of the Plaza Area

The manner in which the Plaza Area has been used suggests it is a nonpublic forum, because its use has been tied to Arena events.   It is well established that "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *Bowman*, 444 F.3d at 978 (quoting *Grace,* 461 U.S. at 177).  In *Bowman*, the Eighth Circuit noted that even though an area on a university's campus may possess "many of the characteristics of a public forum, such as open sidewalks, '[it] differs in significant respects from public forums such as streets or parks or even municipal theaters.'" *Bowman*, 444 F.3d at 978 (quoting *Widmar v. Vincent,* 454 U.S. 263, 268 n.5 (1981)).  The court in *Bowman* concluded that a university's purpose and traditional use was not to "to provide a forum for all persons to talk about all topics at all times," but to serve as an enclave devoted to higher education.  *Id.* (citation omitted).  Thus, the court noted that "streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus." *Id.*

Similarly, in *Hodge*, the D.C. Circuit explained that "the Supreme Court plaza's status as a nonpublic forum is unaffected by the public's unrestricted access to the plaza at virtually any time." *Hodge*, 799 F.3d at 1160.  The court in *Hodge* adopted much of its reasoning from the Second Circuit's decision in *Hotel Employees. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 547–

53 (2d Cir. 2002). In *Hotel Employees*, the court held that the main purpose of the plaza outside Lincoln Center in Manhattan was to "serve as the 'forecourt' for the performing arts halls at Lincoln Center, and, unlike a park or public thoroughfare, the Plaza has not traditionally served as a forum for debate or assembly." *Hotel Employees*, 311 F.3d at 547. The court specifically noted that "[a]lthough the Plaza's design clearly invites passers-by to stroll through or linger, the Plaza was not created primarily to operate as a public artery, nor to provide an open forum for all forms of public expression." *Hotel Employees*, 311 F.3d at 552 (citing *First Unitarian Church v. Salt Lake City Corp.,* 308 F.3d 1114, 1125-27 (10th Cir. 2002)). For this reason, the court concluded that "permitting speech on all manner of public issues in the Plaza would compromise the City's ability to establish a specialized space devoted to contemplation and celebration of the arts." *Hotel Employees*, 311 F.3d at 552.

In this case, there is no genuine dispute about the principal purpose of the Plaza Area. There is no evidence of its "traditional" or "historic" use, because it did not exist until the Arena was built. The roads, streets, and sidewalks, constructed adjacent to the Arena and the Plaza Area were constructed at the same time as the Arena. (Filing No. 56-2, Aff. Kirkpatrick ¶ 4.) Since its construction, the Plaza Area has been reserved for the use of Arena tenants and the artists or productions they sponsor. Use of the Plaza Area is included in Arena tenants' lease terms. (Filing No. 56-3, Aff. Lorenz ¶ 7.) For example, during concert performance by Paul McCartney, the Plaza Area was used for the sale of concert souvenirs and for a red British phone booth in which concert-goers could take photos. (Filing No. 56-3, Aff. Lorenz ¶ 7.) The Plaza Area also has been used as an exhibit area for trade, RV, and boat shows. (*Id.*) The evidence shows the

Plaza Area is also used to facilitate management of crowds as large as 15,000 people entering the Arena, and as a security screening area. (Filing No. 56-3, Aff. Lorenz ¶ 9; Filing No. 56-4, Depo. Lorenz at 22:8-13, 28:17-22, 30:7-20.) In sum, the evidence demonstrates that the primary use of the Plaza Area has been to serve as a forecourt to the Arena's main entrance, and for purposes specifically related to the Arena.[5] There is no evidence that the Plaza Area has "traditionally been available for public expression, . . . nor does it have as a principal purpose the free exchange of ideas." *Hotel Employees*, 311 F.3d at 552 (citations and marks omitted). Accordingly, the use of the Plaza Area does not indicate that it should be accorded the same level of constitutional protection as a traditional public forum.

### C.    Government Intent and Policy With Respect to the Plaza Area

Ball argues that the City's Policy does not demonstrate that the City intended the Plaza Area to be used as a nonpublic forum, because the Policy was not enacted until after Ball was arrested. The Court recognizes that the government "may not by its own *ipse dixit* destroy the public forum status of streets and parks which have historically

---

[5] Where areas are principally used for the commercial purposes of an arena or stadiums, courts have been reluctant to find a public forum. *See Hubbard Broad., Inc. v. Metro. Sports Facilities Com.*, 797 F.2d 552, 555 (8th Cir. 1986) (Metrodome's principal purpose was as a sports complex and commercial venture, not to provide expressive opportunities, even if some advertising was permitted; city did not create public forum) For example, in *United Church of Christ*, although the Sixth Circuit held that the sidewalk surrounding an arena and baseball stadium was a traditional public forum, it held that a plaza area adjacent to the walkway, known as "the Commons," was a nonpublic forum. *United Church of Christ*, 383 F.3d at 453. The plaintiff argued that the Commons acquired designated public forum status because, although access was usually restricted during game time, arena and stadium managers had, in the past, allowed several non-ticketed fans into the Commons during games. *Id.* The court concluded that the Commons were not a public forum because the non-ticketed fans allowed into the Commons were interested in the outcome of the baseball games taking place inside the stadium and their presence on the Commons directly furthered fan enjoyment. *Id.* Thus, the practice of allowing the public onto the Commons during games fell short of allowing everyone equal access to the Commons. *Id.*

been public forums." *Grace*, 461 U.S. at 180 (citations and quotations omitted). Specifically, the government cannot "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property." *Id.* Yet there is no legal support for the proposition that government intent must be memorialized in writing for purposes of the public forum analysis.

As discussed above, there is no evidence that the City or SMG ever intended to use the Plaza Area as a public forum, nor is there any evidence that the Plaza Area was regularly used as a public forum. Ball asserts that the design and function of the Plaza Area show it was intended to blend into the City's urban grid. In support of his position, he quotes deposition testimony of Tom Lorenz, an SMG employee. When asked whether the Plaza Area was used by the public for purposes other than entrance into the Arena, specifically pedestrians using the pedestrian bridge to travel between non-Arena sites, Lorenz responded, "It can be . . . ." (See Filing No. 61, Br. of Pl. at 14; Filing No. 56-4, Lorenz Depo. at 55:17-20.) The Court cannot infer from Lorenz's answer, however, that the City *intended* to blend the Plaza Area into the City's urban grid. Courts consistently have held that "[p]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *Grace*, 461 U.S. at 177 (citing *Greer v. Spock,* 424 U.S. 828, 836 (1976)). Although the City did not adopt the written Policy until October 2014, the evidence demonstrates that the City at all times intended the Plaza Area to be used in conjunction with the activities of the Arena and its tenants. Permitting all forms of expressive activity in the Plaza Area would be incompatible with that intent.

Having weighed each of the factors, the Court concludes that the Plaza Area is a nonpublic forum. Although the Plaza Area shares several characteristics of a traditional public forum, there is no evidence that the Plaza area traditionally or historically was open to public free expression. Instead, the evidence shows that the Plaza Area has been used principally in conjunction with Arena activities. Further, there is no evidence that the Defendants intended to open the Plaza Area as a forum for public free expression. Accordingly, there is no genuine issue of material fact as to the status of the Plaza Area as a nonpublic forum.

## II.    Reasonableness of the Policy

The Policy is reasonable because it is content neutral and does not unduly curtail free speech near the Plaza Area. "When public property is not by tradition or designation a public forum, the controlling public entity 'may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Victory*, 640 F.3d at 334 (quoting *Perry,* 460 U.S. at 46). "A limited public forum, like a nonpublic forum, may be 'limited to use by certain groups or dedicated solely to the discussion of certain subjects,' and the public entity 'may impose restrictions on speech that are reasonable and viewpoint-neutral.'" *Id.* at 334-35 (quoting *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010)).

The Court has held that the language of the Policy is content neutral. (Filing No. 24 at 19.) There is no argument or evidence to demonstrate the Policy is content-based on its face. Ball nevertheless argues that the Policy is not viewpoint-neutral because it

has been enforced only against him. Ball does not present any evidence to demonstrate that he was targeted for enforcement based upon his viewpoint. Ball relies on evidence that artists using the Arena, such as Neil Young, were permitted to set up tables on the Plaza Area with political messages. However, the evidence is clear that such messages were part of the artist's use of the Arena. (Filing No. 56-4, Lorenz Depo. 24:2-24.) There is simply no evidence that Ball "was prevented from speaking while someone espousing another viewpoint was permitted to do so." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 n.4 (2014). Nor is there any evidence that Defendants engaged in "a pattern of unlawful favoritism." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002). Instead, the evidence demonstrates that individuals using the Plaza Area did so in conjunction with their commercial use of the Arena.

Ball also argues that the Policy is vague and permits broad discretion in SMG's enforcement of the Policy. A law may be "impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 358 (1983)). Under the vagueness doctrine, legislatures must "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358. Such minimal guidelines are to prevent law enforcement from having absolute discretion as to the type of activity that violates a law. *Morales*, 527 U.S. at 61. The Policy unambiguously states that "charitable solicitations" and "leafleting, signature gathering, promotional material distribution, merchandise sales, and picketing" are only allowed in the "non-public forum exterior Arena areas at the request of a Tenant, the Tenant's contractual entity and/or the artists or productions

they represent." (Filing No. 56-3 at ECF 5.) The Court concludes that this language is not vague nor does it grant SMG or the City absolute discretion in identifying a violation of the Policy.

The limited boundaries of the nonpublic forum, and the availability of nearby areas open for expression, also demonstrate that the Policy is reasonable. "The reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." *Victory*, 640 F.3d at 335 (quoting *Perry*, 460 U.S. at 53). As this Court noted previously, the evidence in the record indicates that the Plaza Area falls between the main Arena entrance and the City's Haymarket district. While Ball expressed a desire to distribute his leaflets in an area where crowds approaching the south entrance of the Arena are most congested, the Policy does not deprive him of access to most pedestrians approaching the south entrance of the Arena, nor does not substantially alter his desired leafletting position. If Ball distributes his leaflets on the walkways outside the Plaza Area, he simply will communicate with the crowd when it is not at its most congested point. Accordingly, the evidence demonstrates that the Policy is reasonable.

## CONCLUSION

For the reasons stated above, the Court concludes that the Plaza Area at issue in this case is a nonpublic forum for purposes of the First Amendment. There is no material dispute that the Plaza Area was not traditionally or historically open to free expression, nor is there any material dispute that the Defendants did not intend the Plaza Area to be used for public exchange of ideas. Instead, the undisputed evidence shows that the nature and use of the Plaza Area primarily have been associated with

the commercial purposes of the Arena. The Court concludes that the Policy is a reasonable restriction on speech. Accordingly,

IT IS ORDERED:

1.    The Motion for Summary Judgment (Filing No. 55) filed by Defendant City of Lincoln is granted;

2.    The Motion for Partial Summary Judgment (Filing No. 57) filed by Defendant SMG is granted;

3.    The Motion for Leave to File Rebuttal to Defendants' Supplemental Index of Evidence (Filing No. 69) is denied as moot;

4.    All other pending motions in this case are denied as moot;

5.    This case is dismissed with prejudice; and

6.    A separate judgment will be entered.


Dated this 23rd day of June, 2016.

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge